### JAMES C. SOWERS v. THE TERRITORY.
(Filed July 30, 1897.)

1. RAPE—*Definition of.* Rape, to be committed upon a person of the age of 17 years and at the time of sound mind, not under the influence of intoxicating, narcotic or anesthetic agents, or unconscious of the nature of the act, is defined by our statutes as an act of sexual intercourse, accomplished with a female, not the wife of the perpetrator, where she resists, but her resistance is overcome with force or by violence, or where she is prevented from resisting by threats of immediate and great·bodily harm accompanied by apparent power of execution. Without force, actual or constructive, there can be no rape. To authorize a conviction the testimony must show that the prosecutrix resisted to the extent of her ability. If, however, she submits from terror or the dread of greater violence, caused by threats, the intimidation becomes equivalent to force.

2. EVIDENCE—*What Must be Shown to Convict.* Under the statutes of this Territory, in order to convict where resistance is not shown, it must be shown that the accused made threats of immediate great bodily harm to the prosecutrix; that such threats were accompanied by a power of execution which at the time was apparent to her; that she believed, at the time those threats were made, that they would be carried into immediate execution, if she resisted, or unless she ceased from resisting and acquiesced in the act of the accused.

3. EVIDENCE OF PROSECUTRIX ALONE—*Not Sufficient.* At common law, where the accused was not permitted to testify in his own behalf, the testimony of the prosecutrix might be sufficient to warrant a conviction for rape; but under the statutes of this

Territory, where the accused avails himself of the right to testify, and clearly and explicitly denies the commission of the offense, there must be testimony corroborating that of the prosecutrix to authorize a conviction.

(Syllabus by the Court.)

*Error from the District Court of Noble County; before A. G. C. Bierer, District Judge.*

*Thomas H. Doyle* and *S. H. Harris,* for plaintiff in error.

No briefs on file for defendant in error.

Opinion of the court by

TARSNEY, J.: The defendant, James C. Sowers, was, at the November, 1895, term of the district court of Noble county, convicted upon an indictment charging him with the crime of rape, committed upon one Katie Sowers, the daughter of the defendant. The conviction was of rape in the second degree, and the defendant being sentenced to imprisonment in the Territorial prison for the term of nine years, having unsuccessfully moved the court for a new trial and in arrest of judgment, brings the case to this court by petition in error.

Numerous assignments of error are presented in the record, such as that the court erred in overruling an application of the defendant for a continuance in the cause; in overruling defendant's challenge to members of the jury for cause; in permitting improper conduct of the prosecuting attorney in conducting the cause; in admitting incompetent testimony on the part of the prosecution; in excluding competent testimony offered on the part of the defendant, and in overruling an application of the defendant for a change of judge for the trial of said cause.

In the oral argument of this case in this court, counsel for defendant did not seriously contend that any of these errors, thus assigned, would of themselves, and standing alone, call for a disturbing of the judgment, unless that relating to the change of judge, but insists that each and all of them have a bearing upon and should be considered by the court in determining the point relied upon by the defendant, that the verdict was not supported by the evidence, that the previous errors of the court influenced the minds of the jury to consent to a verdict, not warranted by the evidence. The main contention of the defendant is that there was no evidence or no sufficient evidence to warrant the conviction. While the ordinary rule approved by this court is that where there is any evidence to support the verdict, or where the evidence is conflicting, the appellate court will not examine the record for the purpose of ascertaining or determining the weight of such evidence, and the verdict approved by the trial judge will be allowed to stand; but cases of the character of the one at bar have always been held an exception to such rule; and even exceptional, in this and other particulars, from the rules of procedure in ordinary criminal cases. Sir Matthew Hale, in Pleas of the Crown, vol. 1, p. 363 (Ed. of 1778,) distinguishes this character of case and the procedure from other criminal cases, and lays down certain rules and admonitory advice that have been approved by the courts of every jurisdiction since that day. He says:

"It is true that rape is a most detestable crime, and therefore severely to be punished, with death; but it must be remembered that it is an accusation easily to be made, and hard to be proved, and harder to be defended by the party accused, though never so innocent."

He then mentions some unfounded malicious prosecutions for rape, among them a case tried before himself, where the prosecutrix swore positively to the commission of the offense, and it turned out upon inspection to have been physically impossible for the accused to have committed the offense. He adds:

"I only mention these instances that we may be more cautious upon trials of offenses of this nature, wherein the court and jury may with so much ease be imposed upon without great care and vigilance, the heinousness of the offense many times transporting the judge and the jury with so much indignation that they are hastily carried to the conviction of the person accused thereof by the confident testimony, sometimes of malicious and false witnesses."

The indictment in this case charged the defendant with the crime of rape in the first degree by making an assault upon the prosecutrix, and by force and violence and against the resistance of the prosecutrix, and by overpowering such resistance by force and violence that he did ravish and rape and carnally know and have sexual intercourse with said prosecutrix, she then and there not being the wife of the defendant.

Whether necessary or not, in order to support a conviction of rape in the second degree, this indictment did charge that the defendant prevented resistance on the part of the prosecutrix, by threats of immediate and great bodily harm, accompanied by apparent power of execution, and therefore the indictment clearly and plainly, in addition to being a good indictment to sustain a verdict of rape in the first degree, specifically charges the crime of rape in the second degree, under

the provisions of the fourth clause of sec. 1, art. 26, ch. 25, Statutes of Oklahoma, 1893, as amended laws of 1895, page 105, which reads as follows:

"Fourth. Where she is prevented from resisting by threats of immediate and great bodily harm accompanied by apparent power of execution."

We have carefully examined all the testimony preserved in this record. The testimony of the prosecutrix may be fairly summarized thus: That she, at the time of the alleged offense, was a girl of 17 years of age, weighing 145 pounds; that her mother died in January, 1895; that they were living in the city of Perry; that after the death of her mother the greater part of the care of her brothers and sisters, of whom there were five younger than herself, fell to her. That on the evening of April 14, 1895, it being Easter Sunday, she went to church in company with a number of young people, including a young man named Douglas. That her father, the defendant, was opposed to her keeping company with said Douglas.

That after the conclusion of the church service, the party went to the depot and remained there until about 10 o'clock, when they went to an ice cream parlor and remained until after 11 o'clock; that when, between 11 o'clock and fifteen minutes after, the prosecutrix, in company with said Douglas, were on their way to her home, and a couple of blocks therefrom, they were met by the defendant, who made an assault upon the said Douglas, and severely beat him; that she went home with her father and went to bed; that about 3 o'clock of that night her father came into her room and attempted to take liberties with her person; that her little sister,

12 years old, was in the room with her; that her father sent the little one out of the room and locked her out. That by her resistance and beseeching she induced the defendant to desist from his attempt to have sexual intercourse with her and to retire to his own room; that on the next night, about 1 o'clock, the defendant came again to her room and lay down with her and took improper liberites with her person; that she resisted and cried out; that he put his hand over her mouth and told her if she didn't hush crying he would kill her; that at the time defendant came into her room her two sisters, one 12 and the other 9 years of age, were in bed with her; that the elder of the younger girls, while the defendant was in bed with her, got up and lit a lamp; the defendant made her blow it out and made her get back into bed, he still remaining there; that he was in bed with her in all about a half an hour; that her door was not locked that night; that the defendant then had sexual intercourse with her that night; that when defendant assaulted her, she did nothing to resist him except to cry and beg him not to mistreat her; she says she was afraid to do anything else, because he had threatened to kill her if she made any noise; that after the defendant had had sexual intercourse with her he directed her to get up and use a syringe that was in the house, and she did get up and use the syringe to prevent conception; that the defendant objected to her keeping company with Douglas because his reputation was bad; that on the next day she told a Miss Siegler about it and also told other parties about the same time.

The following is her exact testimony as to what she told Miss Siegler:

"I told her that my father had mistreated me, had insulted me; I don't remember, but I believe I asked her what she would do about it if she was me.

"Q. Is that about the language you used? You told her your father had insulted you? A. As well as I remember, it was.

"Q. Now did you tell her that he attempted to take improper liberties with your person? A. I don't think that was the language I used.

"Q. You think you just told her he insulted you? A. Yes, sir; had come to my room the night·before—a night or two before.

"Q. And insulted you? A. Yes, sir.

"Q. Is that all you told her that you can remember of? A. Yes, sir; I believe it is. I don't remember whether that was all or not; I think it was.

"Q. Who did you next tell about it? A. The Hawkins girls, I believe are the next ones I told; Edna and Ida.

"Q. What did you tell them? A. I said that papa was not very kind to me, didn't treat me very well. They said that he seemed to be very kind; I said they didn't know anything about it, that he had insulted me."

Bertha Sowers testified substantially that she was 12 years of age, a sister of the prosecutrix and daughter of the defendant; that she, Katie, and a little sister past 9 years of age, were in bed together; that defendant came to the room and got into the bed; that Katie was upon the outside, the little one in the middle and the witness at the back of the bed; that defendant got into the bed on the outside of Katie; that witness got up and lit the lamp; that in about fifteen minutes defendant made her blow it out and get back into bed; that Katie was crying and kicking the defendant, and trying to make him go away and leave her alone; that witness tried to make him leave her alone, by talking to him; that he

told her to shut her mouth. Witness was asked if she knew what defendant was trying to do then, and answered "yes, I do; common sense would teach me that." Witness being asked if she knew what he did answered, "Yes, sir;" and being told to tell it, replied in language too indecent to insert here. That defendant was whispering to the prosecutrix and that she talked with him but did not talk in a whisper; that witness could hear what the prosecutrix said. Being asked what she did say, answered, she would just say, "Well, I wont do it; leave me alone; everything like that;" that while defendant was in the room prosecutrix got up and left the room; that when witness got up and lighted the lamp, there was a pistol on the lamp stand.

On cross-examination, the witness stated that she was asleep when her father came into the room, but awoke immediately. The lamp was not then burning; that while the defendant was in the bed the prosecutrix was slapping and kicking him and saying "she would not do it;" that witness could hear all her sister said but could not hear what defendant said. That after defendant went out of the room her sister went out and then came back; that there was no talk between her and her sister that night after her father left regarding what had occurred; that witness did not tell anybody of the occurrence the next morning; that her sister did not tell her not to tell anything; that the boys always sleep in a room on the west side of the house; that she did not tell her sister that night that she saw any pistol on the stand, but told her afterwards, more than a week afterwards. That it was quite a long time after the occurrence that her sister spoke to her about it.

On re-direct examination, by the county attorney, the following occurred:

"Q. Miss Bertha, on cross-examination you have said sometime after the night of the 15th you had a conversation with your sister?    A. Yes, sir.

"Q. Your sister, Katie?    A. Yes.

"Q. You may state now, if you remember what that conversation was about?    A. Why it was just about papa mistreating her, and I told her about his mistreating me."

This answer the defendant asked to be stricken out and taken from the jury.

By the court: "What she said about his mistreating this girl is improper."

"Q. You say you were talking with Katie about your father mistreating her?    A. Yes, sir.

"Q. You mean about getting in bed with her?    A. Yes, sir."

The prosecutrix being recalled, stated that at the time of the occurence she had on a pair of drawers that were fastened on the sides; they were closed, and that the defendant tore them off; that she held them, and he said if she didn't turn herself so he could unbutton them he would tear them, and he did tear them.  This was substantially all the testimony for the Territory, except the testimony of the parties to whom the prosecutrix made statements as to the occurence, which was afterwards, by the court, together with all the testimony referring to what occurred relating to an assault on the night of the 14th, withdrawn from the jury.

The defendant testified in his own behalf and denied in toto any assault or any sexual intercourse between himself and the prosecutrix, or that he had ever attempted to take any improper liberties with her person.

Defendant also introduced evidence of other witnesses, tending to establish improper relations between the prosecutrix and Douglas, and tending to show that they had been seen on several occasions at very late hours of the night, after midnight, in remote and obscure places in the city, in compromising situations. The defendant also testified that on the night of Easter Sunday, when the time for the prosecutrix to return from church had arrived, that he went in search of her; that at intervals he went from his house to town, looking for her, and back to the house to see if she had returned; that about 1 o'clock in the morning, and when it was quite dark, he discovered the prosecutrix and Douglas sitting or lying in a large vacant lot near a vacant house or shanty; that when they started to return to the house he intercepted them and assaulted Douglas; that on returning to the house with his daughter he got a horse whip and whipped her.

On rebuttal the prosecutrix denied being in that vacant lot and denied that her father whipped her on that night, but admitted the whipping to have occurred on some other occasion.

To whatever theory of this case, as presented by the evidence, we may turn, it presents a state of human depravity shocking in the extreme. The theory involved in the indictment and conviction differing only in the degree of its depravity from that presented by the defense. While upon the one hand it shocks reasonable probabilities that a father, with ordinary education and in the enjoyment of the ordinary advantages of civilization, should, with or without force, debauch his own child, and this in the presence and with the full knowledge of

two others of his children, it is not more reasonable or probable that a girl, having the education and training of the prosecutrix and to a degree, at least, surrounded by religious influences, should, merely because her personal associations were interferred with or sought to be controlled by her father, fabricate against him this heinous charge, and by flagrant perjury seek to remove him to a long period of imprisonment. Yet, the issue between these theories was the issue involved, and to be determined by the jury, and the burden is now upon us to review the conclusion of the jury and to determine whether such conclusion can be upheld by the evidence presented upon this record.

If the indictment charged the crime of incest, we would yet have great doubt whether the verdict of conviction should be upheld; as, to convict, the evidence should be of that character as to have satisfied the minds of the jury of the guilt of the accused beyond a reasonable doubt; and if a fair and impartial consideration of all the evidence presents the conclusion that it could only produce a reasonable doubt of guilt, in the minds of an ordinary and impartial jury, then, as a matter of law, the conviction should not be sustained. But the issue in this case, as presented by the evidence, is much narrower, and there is less difficulty in arriving at a fairly satisfactory conclusion than though the guilt or innocence of the defendant of the crime of incest had to be determined. We may concede the evidence to show, although the fact is denied, that the accused had sexual intercourse with and debauched his daughter, but we have no right, nor had the jury trying the cause, any right, to allow a natural abhorence for such unnatural conduct to influence

or bias their judgment in determining the weight and sufficiency of the evidence, as to the one essential fact, involved in the issue presented by this indictment.

The issue herein to be determined by the jury was, is the accused guilty, not of incest, but of the crime of rape? At the common law, rape is thus defined: "Rape is the carnal knowledge of a woman, by a man, forcibly and unlawfully, where she does not consent." (Statute of Westminster 2, defining the offense.)

Rape, to be committed upon a person of the age of the prosecutrix, at the time of sound mind, not under the influence of intoxicating, narcotic or anesthetic agents, or unconscious of the nature of the act, is defined by our statute as an act of sexual intercourse accomplished with a female, not the wife of the perpetrator, where she resists but her resistance is overcome with force or by violence, or where she is prevented from resisting by threats of immediate and great bodily harm *accompanied by apparent power of execution.*

Without force, actual or constructive, there can be no rape. (*Osgood v. State,* 64 Wis. 472; *McNair v. State,* 53 Ala. 453.) It must be shown that the prisoner intended to gratify his passion at all events, and notwithstanding the utmost resistance on the part of the woman. (*State v. Hagerman,* 47 Io. 151; *Mahoney v. People,* 43 Mich. 39.) There can be no rape of a female within the age of consent, where there is consent, no matter how reluctlantly it be given. (*State v. Burgdorf,* 53 Mo. 65; *Whittaker v. State,* 50 Wis. 518; *Brown v. People,* 36 Mich. 203.) To authorize a conviction for rape the testimony must show that the prosecutrix resisted to the extent of her ability. (*Matthews v. State,* [Neb.] 27 N. W. 234.)

In *State v. Burgdorf*, 53 Mo. 65, *supra*, the court says:

"The crime under consideration can, in the language of one of the authorities, only be committed where there is on the part of her on whom the attempt is made, the utmost reluctance and the utmost resistance; the passive policy or a mere half-way case will not do."

In *Connors v. State*, 47 Wis. 532, it was held error for a trial court not to press upon the attention of the jury the rule that voluntary submission by the woman, while she has the power to resist, however reluctantly yielded, deprives the act of an essential element of rape. To the same effect are the cases of *Dan Moran v. People*, 25 Mich. 356; *People v. Hultz*, 3 Hill (N. Y.) 316; *Pleasant v. State*, 13 Ark. 360.

If, however, the woman submits from terror, or the dread of greater violence caused by threats, the intimidation becomes equivalent to force. (*Turner v. People*, 33 Mich. 363; *Huston v. People*, 121 Ill. 497.)

Under the statutes this utmost resistance can only be dispensed with or excused when the prosecutrix is prevented from resisting by threats of immediate and great bodily harm, accompanied by apparent power of execution. In the case at bar, there is no contention that the woman offered any substantial resistance. Kicking, slapping the accused, refusing, at his request, to unbutton her drawers, or saying, "Well, I wont do it; leave me alone," etc., does not evidence that resistance which the law required to be shown and which must be shown to justify a conviction. This was the conclusion reached by the jury. The conviction being for rape in the second degree, which under the statute assumes that there was no resistance but that resistance was prevented by threats accompanied by apparent power of execution;

and this presents the material question which the jury
was required to determine in order to convict. Does the
evidence support the conclusion that the prosecutrix was
prevent.d from resisting by threats of immediate great
bodily harm, which threats were accompanied by an ap-
parent power of execution? Nothing less would justify
a conviction. There must have been threats of great
bodily harm—immediate bodily harm—and those
threats have been accompanied by a power of execution
which at the time was apparent to the prosecutrix; not
only this, but she must have believed, at the time, that
those threats would be carried into immediate execution,
unless she ceased from resisting and acquiesced in the
act of the accused. Nothing short of the presentation of
these facts and the satisfying of the jury of their truth,
beyond a reasonable doubt, would warrant the conviction
of the accused. And nothing less than evidence, in this
record, to reasonably convince our minds that the ac-
cused, for the purpose of accomplishing his purpose of
having sexual intercourse, threatened her with immedi-
ate great bodily harm, was then possessed of power to
carry such threat into execution, that such power was
apparent to the prosecutrix, that she believed that the
threat would be carried into execution, if she resisted,
and was thereby induced to acquiesce, will justify us in
sustaining this judgment. If we were to consider only
the testimony of the prosecutrix, who would naturally
state the fatcs as strongly as possible against the ac-
cused, we could not be satisfied that the evidence sup-
ports the conviction. She says he threatened to kill her,
not, if she did not submit to his purpose, but if she did
not stop her noise; and the only noise shown was her

29—

talking and telling him "she would not do it;" that she would not yield. She does not claim that at the time the threat was made he was choking her; that she was in danger of strangulation, or other great bodily harm that might have been inflicted upon her by means of a pistol or other dangerous weapon, or that he was possessed of any means to kill her, and carry his threat into execution. She was a woman 17 years of age, weighing 145 pounds, in vigorous health; by her side was a sister 12 years of age; in a room not far removed was a brother 14 years of age; the accused, for aught she knew, was unarmed and had no means of obtaining any weapon of violence or other power of carrying his threats into execution save that of matching his natural strength against hers, and the assistance which would naturally come to her from the others present and in the immediate vicinity. We do not think, under these circumstances and under her own statement of the occurrence, she could have believed, or did believe, that if she did not acquiesce, her life was in immediate danger. According to her own version of the transaction, there appears too much of that character of resistance or acquiescence under duress characterized by Sherwood, Judge, in *State v. Burgdorf*, as "the passive policy." But the sister, who was in the bed with her, heard no threat made; no angry or violent talk on the part of the accused; claims only to have heard the accused speaking to the prosecutrix in a whisper; besides, the action of the prosecutrix in immediately, coolly, taking precautions to prevent conception from the intercourse, does not exhibit that mental condition that would naturally be presumed in one who had just been compelled, under the terrors of the

fear of immediate death, to submit to that which, considering the relationship involved, to a woman who prized her virtue, or did not find gratification in its pollution, would have been considered an humiliation from which death might be welcomed as a relief.

By the common law, where the defendant was not competent to testify in his own behalf in cases of this character, the testimony of the prosecutrix alone was held sufficient to sustain a conviction; but under statutes like those of this Territory, where the accused is a competent witness, it is held that the testimony of the prosecutrix, without corroboration, is not sufficient to sustain a conviction. (*Matthews v. State*, 19 Neb. 330.) In the case at bar, the prosecutrix is not corroborated as to the material facts. If the charge was incest, then she would be fully corroborated by the testimony of her sister, who testified to the sexual intercourse; but as to the material facts distinguishing the case as that of rape from incest, namely: That the accused made threats and by reason of his immediate and apparent power and ability to execute them, the prosecutrix was induced to desist from resistance, is not corroborated. as the sister, who was in a position to have heard the threat made, if made, does not testify concerning any threats; nor does the attempted corroboration, in the usual manner in such cases, support her testimony, for though she claims to have made complaint to others  immediately thereafter, her own testimony does not show that she complained that the accused had committed rape upon her person, but at the fartherest, her evidence on that point only establishes that she complained that he had mistreated and insulted her, which may be perfectly true and be

corroborated of the defense, rather than the prosecution. For it is shown that he objected to the company she was keeping, assaulted her chosen associate, and administered a whipping to herself.

We cannot eliminate from consideration the elements of probability or improbability arising from the facts; and it certainly is not consonant with any rational probability that the accused should have been moved with consideration for the virtue of his daughter, and of watchful care for her safety, that would induce him to assault one who, by reason of bad reputation he deemed an unsafe associate for her, and then, within an hour or so thereafter, debauch her himself.

The defendant was indicted on November 22, 1895, on the 29th of the same month was arraigned, and on the 30th entered his plea of not guilty. On December 2, he moved for a change of judge, which was overruled, and the cause was set for trial on the next day. An application for a continuance being overruled, and a jury being summoned on December 6, the trial was commenced; but two days were allowed defendant to prepare for trial. Jurors were permitted, notwithstanding a challenge for cause by defendant, to serve, who stated that they had formed opinions relative to the guilt or innocence of the defendant, which opinions were of a fixed character, and would require evidence to be removed. It is true that such jurors stated that their opinions were based upon public rumor, and that notwithstanding such opinions they could fairly and impartially try the case. On the trial of the case, the prosecuting attorney was permitted to cross-examine the accused in relation to his previous conviction of the offense of having permitted rooms, in a

building under his control, to be occupied by women having the reputation of prostitutes.  The court permitted evidence by parties to whom the prosecutrix claims to have made complaint of the acts of the accused to be introduced with relation to the details which she related concerning the occurrence.  It is true that, after the Territory had rested, this testimony was withdrawn by the court from the consideration of the jury; but it could not but have had an influence upon the minds of the jury, prejudicial to the defendant.  The court permitted the introduction of a conversation between the prosecutrix and her sister long after the occurrence, not in the presence of the accused, and in which the sister testified that she had told the prosecutrix that the accused had also mistreated her.  True, the court at the time, stated that the testimony relating to any mistreatment of the sister was improper, but he did not withdraw it from the jury nor instruct them that they should give no consideration to it, and whether this would be sufficient error to warrant a reversal or not, it could not but have been, in some measure, prejudicial to the accused.  The court permitted testimony to be introduced showing that some time subsequent to the act complained of, prosecutrix was informed by her sister that a pistol was on a stand in the room on the night of the occurrence.  This was clearly error, and each of these matters, though they might or might not, in themselves, standing alone, require a reversal of the judgment, when taken together and in connection with the facts that the cause was sent to trial without the ordinary time or opportunity for preparing a defense, and presented to a jury, a part of whom at least, had opinions pre-existing as to defend-

ant's guilt, we are compelled to the conclusion that the verdict was not arrived at by a careful and impartial consideration of the weight of the legal evidence introduced; and making all allowances for the superior opportunities of the jury to weigh the facts by reason of the personal presence of the witnesses before them and their observance of their demeanor and their apparent candor or want of candor and truthfulness, we are constrained to the conclusion that the evidence in the cause will not support the judgment.

Upon the point that the court erred in not granting motion for a change of judge, the question involved has been fully considered and decided by this court at this term in the case of *Cox v. United States*, and the decision in that case must govern upon this point in this.

For the reasons stated herein, that the evidence does not support the verdict, this cause is reversed and remanded for a new trial.

KEATON, J.: I concur with the conclusion reached in the foregoing opinion and believe that the case should be reversed and remanded for a new trial because of the commission of error on the part of the trial court, both in overruling the application for a change of judge and in admitting incompetent testimony; but I do not agree with the reasoning therein contained to the effect that the evidence is wholly insufficient to support the verdict or with the conclusion reached thereon.

Bierer, J., who presided in the court below, not sitting; Dale, C. J., concurring; McAtee, J., dissenting.