JAMES HARMON v. THE TERRITORY OF OKLAHOMA.

(Filed February 11, 1905.)

1. EVIDENCE—Sufficiency of. Where a jury find the evidence sufficient and return a verdict of guilty, and the trial court denies a motion for a new trial, the supreme court will not set aside such verdict, unless, assuming to be true all that is testified to, the presumption of innocence is not overcome.

2. SAME—Admissibility of. In a trial for the offense of rape any evidence tending to corroborate the evidence of the complaining witness, or to show an assault and the manner of its commission at the time and place charged in the indictment, is admissible, even though it show an assault upon another person at the same time.

3. SAME—Impeachment of Witness—Stenographer's Record. A witness may be impeached by showing that he has testified in another proceeding involving the same subject-matter, different from and inconsistent with his testimony sought to be impeached, and for

such purpose the stenographer who took his testimony on the former occasion is a competent witness, and for the purpose of accuracy may refresh his memory from his long hand transcript of the evidence taken on such former occasion.

4. SAME—Carbon Copy of Stenographer's Transcript. Where the stenographer's short hand notes of testimony have been by him transcribed in long hand, and at the time of so doing he makes duplicate carbon copies of the same, such duplicate carbon copies are not copies in the sense in which the word "copy" is ordinarily used, and the use of such a carbon copy by a stenographer testifying, from which to refresh his memory, is not error.

5. TRIAL—Conduct of Counsel. Where counsel for the Territory in the trial of a criminal cause gives expresion to inarticulate utterances expressive of contempt for an answer made by a witness, and during the trial of such cause denominates a witness as a "smart aleck" and refers to documents offered in evidence as having been prepared by a "shyster" or "jack-leg", such conduct deserves the immediate rebuke of the trial court, but does not necessarily constitute reversible error.

6. MEDICAL EXAMINATION. A medical examination of the prosecutrix is not indispensible to warrant a conviction for the crime of rape.

7. INSTRUCTIONS—Force and Resistance of Prosecutrix. It is not necessary for the court to instruct or caution the jury that "the charge of rape is easily made, hard to prove, and harder still to disprove." The court instructed the jury that they must be satisfied beyond a reasonable doubt "that the prosecuting witness resisted to her utmost capacity, and that her resistance was overcome by force and violence." That was all that was necessary.

(Syllabus by the Court.)

*Error from the District Court of Pottawatomie County; before B. F. Burwell, Trial Judge.*

*Snyder & Clark, J. W. Johnson, John W. Scothorn,* and *L. G. Pitman,* for plaintiff in error.

*P. C. Simons, Attorney General,* for defendant in error.

STATEMENT OF FACTS.

At the November, 1902, term of the district court of Oklahoma county an indictment was returned by the grand jury charging the defendants, James Harmon and Ann

Wynn, with the crime of rape, committed upon the person of Annie Patt, in said county, on the 26th day of January, 1903, which indictment was filed and returned February 23, 1903, and during the term aforesaid. On the 7th day of May, after a severance of trial had been granted, the defendant James Harmon gave notice of and filed his application for a change of venue in the trial of said cause, and afterwards, on the 11th day of May, 1903, such application for a change of venue, having been heard by the district court of Oklahoma county, an order was entered changing the venue in the trial of the cause from Oklahoma county to Pottawatomie county, and thereafter on the 30th day of November, 1903, said cause came on to be heard and was tried in the district court of Pottawatomie county.

From the trial of the case it appears that the prosecutrix, Annie Patt, twenty-two years of age, was born in Leowalden, Holland, where she resided until about two years before the date of the trial of this cause. At the time she left Holland with a sister and brother-in-law, she went direct by way of Amsterdam and New York to Nanpa in the state of Idaho, where she resided and worked on a farm a year, her mother and step-father having in the meantime left Holland, and come to Oklahoma City. The prosecutrix left Idaho and came to her mother in the city of Oklahoma, where she had resided about two weeks, working at the Windsor Hotel about one week of the time before the occurrence herein complained of. She had in the meantime learned to speak the English language, which to her was an unknown tongue prior to her coming to the United States. It appears from her testimony that in Holland it was a common and usual thing for people to go into beer gardens and beer drinking

places, and drink there, and that on the night of the occur-rence complained of (Sunday) an uncle by the name of Brower came to the Windsor Hotel for her and they together went to where her sister Lucy was working, and the three then went to a place designated as Charley's saloon, and there drank wine and beer, remaining approximately two hours, drinking three glasses of beer and a couple of glasses of wine, the wine and beer being brought to them in a little room by the uncle, except the first order, which was brought by a bartender. They then left as testified to by these girls for home, and having crossed the railroad track they came to a place where dancing was going on, and were solicited by the uncle to go in and see how the Americans dance, and after entering seated themselves upon a lounge. The pro-prietress, Annie Wynn, commonly known as Big Ann, brought them some beer in small glasses, which they said was very bitter and tasted unusual, the drinking of which made them sick, and they, the girls, asked the uncle to take them out of there, when, as testified to by the girls, a number of men then in the place took the uncle and pushed him out of the door locking it behind him, and then solicited the girls to go with them to the rooms of the house, which they refused to do. They were then seized by several men, one being the defendant in this case. Lucy was dragged up stairs to her defilement by two of the men, and the prosecutrix, Annie was by three others forced into a room down stairs and there defiled by each of them, she identifying the defendant posi-tively as one of the men.

The story of the defilement of these girls after being taken, one to a room upstairs and one down, their resist-ance and cries to each other for help, is not fit for publi-

cation in detail. That they resisted to their utmost, that they called for help, is shown by the testimony of each of them.

Evidence was offered on behalf of the defendant by a railroad conductor and a brakeman, who that evening brought their train from Monett, Mo., to Oklahoma City,and put it up, after which they repaired to the premises of Big Ann, and were there when the girls Annie and Lucy and their uncle came. They deny that the uncle was thrown from the door and the girls locked in, and say that they did not see any force used in taking them or either of them up the stairway to the bed room, and did not hear any screams for help, or observe any resistance on the part of the girls.

Witnesses Jessup, Underwood and Cassidy testify that they left the theater in company that evening at about 10 or 11 o'clock and went to this place of Big Ann's and saw these Patt girls there, and saw them when they started out of the dance hall, and Cassidy says he observed them when they had reached the foot of the stair in the hall adjoining the dance hall, and each of these witnesses testify that they did not observe any resistance on the part of the girls or force used on the part of those accompanying them. These witnesses left the premises at this time.

The defendant, Harmon, testified in his own behalf to the effect that he and four others, McGuire, Woodson, Finn and Garrison, on the evening in question went to Big Ann's house of prostitution, and while there the girls, Annie and Lucy Patt and their uncle came into the dance hall. He testified that he saw the girls go up stairs with a number of other persons and went himself as far as the first landing but did not go up the stairs, and that he left the place about mid-

night; that the girls at the time he left were in the dance hall; that he had no intercourse with the prosecutrix, and offered no violence towards her; that he was himself a gambler by profession, and had been for a number of years, following no other vocation. He shows that the parties who went there with him were gamblers and bartenders, that he was acquainted with the several inmates of Big Ann's house, and was himself a frequenter of the several gambling houses of the city.

The testimony of the first witness on behalf of the defendant (Hoyt) is to the fact that he saw Lucy Patt up stairs at the house of Ann Wynn, lying on a bed with George Garrison, and also saw Annie Patt the prosecutrix in another room lying on the bed with another man, he did not know who, and that no force or violence was being used as to either, that they were not undressed, and that he heard no complaint or protestation from either of them; that he afterwards saw Annie and Lucy Patt quarreling with Garrison and others over the question as to whether they should receive two or five dollars, and were each demanding five dollars from the men they were talking to; that George Garrison was one of the men tendering two dollars which she refused and that five dollars was insisted upon.

One of these girls was between three and four o'clock in the morning found on the street by a policeman, wandering about in a half-dazed condition, and was by him taken to the police station. The desk sergeant testified that she reached the police station apparently in an intoxicated condition, bare headed, her hair down, her clothing partially unbuttoned, and denied to him that any man had stayed with her that night, but gave sufficient description of the

place where she had been to enable them to determine it was Big Ann's place. After sending two policemen for it, her hat was finally obtained from Big Ann.

The prosecutrix testified that when first taken to the police station she was not asked whether or not any man had had intercourse with her that night, and being ashamed of her condition she did not tell all of the facts, but asked to be taken home, and later when called upon disclosed all the facts in the case to the police force.

At the conclusion of the testimony the case being submitted to the jury upon the evidence and instructions of the court, the jury returned a general verdict finding defendant guilty as charged in the indictment, and from the verdict, judgment and sentence thereon, committing him to the penitentiary for ten years, he now appeals to this court.

Opinion of the court by

GILLETTE, J.: This case, revolting in its details, comes to this court for review upon seven propositions of error presented by the plaintiff in error. We will notice them in their order.

The first is that the verdict of the jury is contrary to the evidence. Counsel say that the story of the prosecutrix, considered with the evidence of the Territory corroborative thereof, in the face of the evidence of the several witnesses of the defendant, is unreasonable and improbable in the extreme, and adds:

"We think it is within the province of the appellate court, also that it is the duty, in a case of this character, to review the evidence, and if, in the mind of the court, under the evidence, there is a reasonable doubt as to the guilt of the defendant, that a new trial should be awarded."

If this is a correct proposition, the impanelling of a jury of twelve men to try the question of the defendant's guilt or innocence is a useless waste of time and expenditure of money.

Under our jurisprudence a trial by jury is believed to be the safeguard of the citizen charged with the commission of crime. And when lawfully selected, impanelled and charged, that they must be satisfied beyond a reasonable doubt of the defendant's guilt before they can be justified in returning a verdict of guilty against him the question of "reasonable doubt" is thereupon disposed of, and it is not properly within the province of the trial court or an appellate court upon review to determine a question of "reasonable doubt", as it arises from the evidence, where there is any evidence to support each of the necessary ingredients of the crime stated in the indictment.

We know of no standard authority which lays down a rule different from this; and the courts have repeatedly announced the doctrine, that the weight to be given to the evidence in a case tried before a jury is not a subject of consideration. No method of preserving the record of a trial so that a court upon review may correctly determine the weight that should be given to all the testimony, has yet been invented. The appearance of a witness, his countenance and tone of voice, the mode and manner of expression, general demeanor on the stand, his appearance of candor or want of it, has much to do with the weight that will be given to what a witness says, and often times influences a jury in estimating the weight they will give to testimony, as much as the words uttered, and yet that cannot be sent to this court with the record.

How a jury has been impressed, and their verdict influenced by the manner and conduct of a witness, save as it is manifested by their verdict, cannot be known, because it is not written in the record; and yet they are and always have been legitimate sources from which a correct estimate of oral evidence is drawn, and we know of no way in this case whereby this court may rightfully determine a question of reasonable doubt as here submitted for determination by the counsel for plaintiff in error.

We are not unmindful of the fact that the rule here announced is at variance with that expressed by Mr. Justice Tarsney in *Sower v. The Territory,* 6 Okla. 436, and in so far as the opinion in that case is at variance with the opinion here expressed, the same is hereby overruled.

It will be observed by an examination of that case that the opinion is not fully concurred in by a majority of the court, and the same was handed down because of a special concurrence in the opinion of Mr. Justice Keaton, who said, speaking of the opinion as delivered:

"I do not agree with the reasoning therein contained to the effect that the evidence is wholly insufficient to support the verdict, or with the conclusion reached thereon."

Mr. Justice McAtee, dissenting, and Justice Bierer not sitting, leaves that case upon the point here considered supported by only two of the five Justices.

The testimony in the case now under consideration is unquestionably conflicting, and might reasonably support a verdict either way; under which circumstances it was the duty of the jury to cull from the whole that which they could believe, and reject that which they could not give credence to, and in doing so they manifestly gave credence to that of

tbc two girls, Annie and Lucy Patt, rejecting the testimony
of the defendant, who in his testimony admitted that he
was a gambler by profession, a constant and daily visitor
of the gambling houses of the city, a frequenter of the houses
of prostitution, and a frequenter of Big Ann's place, one of
Hell's recruiting stations, shown to have been in existence
for ten years or more, itself a shame and disgrace to the
public administrations that have permitted it, and a blot
upon the fair name of the Territory.

It is true the testimony of the defendant is supported
by the evidence of the railroad conductor and brakeman,
and in minor respects by the evidence of Underwood, Cassidy
and Jessup, but the evidence of these witnesses is tainted by
the same moral leprosy which infects that of the defend-
ant himself. It is also true that the evidence discovers the
prosecutrix and her sister in the same house in which the
defendant and his witnesses are found, and this fact was
plainly before the jury, and in addition the circumstances
under which the several parties went there. Those girls,
as shown by the testimony, were recently from Holland, and
that evening in company with their uncle, their natural guar-
dian and protector, were by him invited to go in and there
to see how Americans danced as distinguished from their
native custom, and did not carry into that house the same
immoral stench that accompanied the defendant and his
witnesses when they went there. The railroad men, leaving
families behind them that morning, on their arrival at Ok-
lahoma City went immediately to Big Ann's, and there spent
the night with the habitues of the place, the other witnesses
leaving a Sunday evening theater, and going direct to Big
Ann's place, there to finish the day's revelry. The society

and associations they were seeking were thoroughly understood by them.   The acts of these were criminal from both a moral and legal standpoint, and their character was fairly expressed by their act.   Such cannot be truthfully said of the girls, and the jury manifestly took this view of the situation, for all this was before the jury.   The attributes of the human mind are such as to enable it to draw a distinction in giving weight and value to the declarations of individuals. .

The jury in this case, having given credence to the testimony of the girls as distinguished from that of the defendant and his witnesses, the court is unable to say that their conclusions are not justified by the evidence. ·

The second ground upon which a reversal of the judgment of this case is asked, is that of misconduct on the part of the assistant prosecuting attorney during the trial of the case, which was prejudicial to the defendant.

The first item of misconduct set forth in defendant's brief is the fact as stated that counsel in the cross-examination of defendant's witnesses, upon answers being made thereto, would grunt and give expression to certain inarticulate utterances expressive of contempt for the answers made.

We have examined the record in this respect, and are unable to find therein such utterances or ejaculations as would lead to a conclusion that the jury were prejudiced on account thereof.   It is also urged that counsel for the Territory characterized Bert Herron as a "smart aleck," and also when a petition in a civil action by the prosecutrix against Big Ann, which petition was not prepared by counsel in this case, was offered in evidence, counsel for the Territory characterized counsel preparing such petition as a "shyster" or "jack leg."

Such language by counsel ought not to be used in the trial of a cause, nor in fact any irritating or exasperating expressions. They occur however at times in the trial of a cause, often unthoughtedly, sometimes intentionally and with a purpose, and in each instance deserve the rebuke of the trial court, which was immediately given in this instance, upon objection being made by counsel for defendant.

Upon presentment of this ground for a new trial, to wit, misconduct of attorney, counsel for the Territory asked a question which assumed that George Garrison, referred to in the evidence, had been convicted; also Butterfly Kid, and again the question was propounded as to whether or not Garrison was in the penitentiary. Objection was made, and the same sustained by the court, and with reference to the first the jury was admonished not to consider it.

Complaint is also made that leading questions were permitted to be asked and answered. In all of this we are unable to find reversible error, especially upon the ground stated, that of misconduct of counsel. Few cases are tried which might not be reversed if the ground here stated were held sufficient. Leading questions ought not to be indulged in when the same can reasonably be avoided, but it often happens where witnesses, as in this instance, imperfectly understand the language, that plain and direct questions are permitted. This is left largely to the discretion of the trial judge.

One other objection is made under this title, which in substance charges counsel for the Territory with referring in uncomplimentary terms to witnesses for the defendant, which is charged to have been outside of the record, and also in the closing argument counsel for the defendant were re-

ferred to as perjurers and standing politicians, men who sported titles which they gave themselves, etc. This appears in the record in connection with the motion for new trial only. What was said upon the trial and in the argument was in the presence of the trial court, who had considered the objection, and held it as insufficient to justify vacating the verdict reached in the case; and this court, from the record here presented is unable to determine that in this respect there is such prejudicial error as to justify a reversal of the judgment found and entered.

The third point argued by counsel for plaintiff in error is the introduction of incompetent evidence, which as stated was the evidence of Lucy Patt, wherein she testified not only to what she saw with reference to her sister Annie, the prosecutrix, but also to what happened to and was done to her by others than the defendant, to wit, George Garrison and one Butterfly Kid, who had previously been convicted of the rape of Lucy.

The court in admitting the evidence advised the jury of the purpose of admitting it as follows:

"The court: Just a moment. Perhaps the jury ought to understand the purpose for which this evidence is being introduced. (To the jury) I probably may as well explain to you now as at any time, and so I will instruct you would not be authorized to infer that this defendant was guilty of ravishing the other girl, though you should find that George Garrison ravished this girl. This testimony is offered for the purpose of explaining her conduct while she was in there and the reason, if any, why she did not go to the resuce of her sister; that is the purpose of it."

Counsel for the defendant complain that the defendant in this case was prejudiced by this evidence, that it was not

competent as against him to show that at the time he is charged with having committed the crime of rape upon Annie Patt, her sister Lucy was being ravished by George Garrison and Butterfly Kid.

In view of the circumstances of this case, limited in its application as it was by the instruction of the court above stated, there was no error; in fact, we are not certain but that the court limited the application of this testimony to a narrower compass than was justified under the circumstances.

Counsel for the defendant in discussing this proposition state the rule with reference to the introduction of such testimony we think correctly, as follows:

"We understand the law to be that such evidence is incompetent, unless it be a crime committed in contemplation of and connected with the crime charged in the indictment, or by way of preparation for the crime charged in the indictment, or the concealment of the crime charged in the indictment."

Underhill in his work on Criminal Evidence says at page 109:

"No separate and isolated crime can be given in evidence. In order that one crime may be relevant as evidence of another, the two must be connected as parts of a general and composite scheme or plan."

And again at page 112, the same author says:

"The general rule is well settled that all evidence must be relevant. If evidence is relevant upon the general issue of guilt or innocence, no valid reason exists for its rejection merely because it may prove, or may tend to prove, that the accused committed some other crime, or may establish some collateral or unrelated fact."

With this rule in mind let us examine the facts under which this testimony was admitted.

On the night in question the defendant Harmon, known as Arkansas Kid, John McGuire, Millard Woodson, known as Butterfly Kid, Jim Finn, and George Garrison, went from the Two Johns saloon and gambling house to the resort of Big Ann, and there met Lucy and Annie Patt, whose testimony shows, that their uncle was thrown out of the room, and they were assaulted by five men, and dragged to separate rooms for their defilement. Three of these men are identified in the testimony of the girls, Harmon the defendant, Butterfly Kid and George Garrison, as being three of the persons who committed this assault, and ravished these girls. If these five men, acting conjointly, made an assault upon these two girls with a purpose and intent to accomplish their defilement, notwithstanding their resistance, and did accomplish it, they are each guilty as *particeps criminis* in the crimes there committed. The prosecutrix, Annie could not have been there forcibly ravished without some disposition being made of Lucy; else the crime would have been open and notorious, and the criminal records forbid such a conclusion and the manner in which Lucy was disposed of became a serious subject of investigation which was shown by the testimony objected to.

The conclusion would be almost irresistible that no force was used in accomplishing Annie's defilement, if the record showed that Lucy quietly awaited Annie's return after being forcibly taken to a room in that house of sin, and equally so if the record were silent with reference to Lucy's acts and whereabouts under such circumstances. It was, the duty, we think, of the public prosecutor to clear away such clouds upon the possibility or probability of guilt, if there was in existence evidence or proof of facts or circum-

stances sufficient to do so, and such proof would be competent, although it may have shown a double, instead of a single crime by the individuals making the assault.

In the trial of the case, other than the declaration of the defendant that he did not have sexual intercourse with the prosecutrix, no defense is offered except that the defilement of these girls was accomplished without force. These girls were respectively of the age of 18 and 22 at the time of the trial, and the law enjoined upon them as a duty to make their utmost resistance before they could be justified in charging their assailants with the crime of rape.

It has been said that a failure to make an outcry by a female at the time of an assault being made upon her with the evident purpose and intent of committing the crime of rape upon her, where there are others within hearing distance, is some evidence of her consent, as distinguished from a claim of resistance. This could not be true except in the nature of things, that such an outcry would bring assistance and relief. It is shown by the testimony of the prosecutrix that she made such an outcry, and at about the same time heard an outcry made by her sister; and it is shown that Lucy heard her outcry; that she did not go to her sister's relief because she was at the time being forcibly held and debauched by Garrison and Butterfly Kid, a hand of one of them being laid over her mouth to prevent as far as possible her own outcries. This evidence explains why she did not go to her sister's relief, as well as the fact that an outcry was made by Annie.

We conclude that the two crimes, having their inception in the assault made upon these two girls by these persons, apparently acting conjointly, are so interwoven in their de-

tails and circumstances that the proof of one is corroborative evidence of the other, and the evidence of this witness was not incompetent because it tended to prove a separate and distinct offense.

Counsel for defendant, as a fourth ground for the reversal of the judgment urge that it was incompetent for the stenographer of the third judicial district, Frank Inglis, in his testimony which was offered for the purpose of impeaching the testimony of Tom Underwood, to use a carbon copy of his longhand transcript of his stenographic notes of Underwood's testimony taken in another case. Mr. Inglis testified that this carbon copy was made by himself and was a correct transcript of Underwood's testimony in the case referred to; that he had examined it and found no changes made in the same since it was made, and he was thereupon permitted to use such carbon transcript in testifying with reference to what Underwood's former testimony was.

Counsel urge that in order for the transcript used to be competent for the purpose used that it should be a transcript as required by sec. 1904, Wilson's Statutes, 1903, which provides:

"Sec. 1904. The shorthand reporter shall file his notes taken in any case with the clerk" etc.

"Any longhand transcript of notes so filed, duly certified by the reporter of the court who took the evidence as correct, shall be admissable in evidence, etc."

In the first place the provision of the statute above referred to has little if any application to the proposition here submitted. No attempt was made to file the longhand transcript of Underwood's testimony. To have done so would have required a full compliance with the provisions of the

statute. But in this case the official reporter was himself, testifying to certain questions which were put to and answered by Underwood in the former case, and for the purpose of accuracy was using a carbon copy of his longhand transcript, which having been made by himself was by him known and proved to be correct. We think the court committed no error in so allowing its use. In fact we do not think a carbon copy of any longhand transcript of a stenographer's official notes, made by the stenographer himself at the time he makes the transcript and as a part of that transaction, is a copy in the sense in which the word copy is ordinarily used, any more than several books or newspapers printed upon the same press at the same time and from the same type, are copies of each other.—See Cyc. p. 886, title copy; Am. & Eng. Enc. of Law, [2nd. Ed.], vol. 10, p. 318, title duplicate and note. *Cutter v. Territory,* 8 Okla., 101.

The fifth objection by counsel for defendant, to the effect that a medical examination of the prosecutrix had not been made, verifying and corroborating the statements of the prosecutrix that a rape had been committed upon her, presents no question for discussion—as proof of the result of such examination is not essential—to justify a verdict of guilty under a charge of this kind.

As a sixth ground of error counsel urge that the charge of the court did not sufficiently apprise the jury as to the amount of resistance which the prosecutrix was required to put forth, and the extent and duration of such resistance: second, that the charge did not caution the jury that the charge of rape was easily made, hard to prove, and harder still to disprove or defend against, even though never so innocent; and, third, the charge of the court was erroneous,

in that the jury was authorized to consider the evidence for any purpose given by the witness, Lucy Patt, as to an alleged rape having been committed upon her by Garrison, Butterfly Kid or any other person.

In the fourth instruction the court instructed the jury as follows:

"Rape is an act of sexual intercourse accomplished with a female not the wife of the perpetrator, where she resists, but her resistance is overcome by force and violence. And in this connection the court instructs you that if you find by the degree of evidence stated in these instructions, that the defendant, James Harmon, alone or aided by any other person or persons, within the county of Oklahoma and the Territory of Oklahoma, as charged in the indictment, did, unlawfully, wrongfully and feloniously accomplish an act of sexual intercourse with one Annie Patt, the prosecuting witness herein, and that said Harmon accomplished said act of sexual intercourse by force and violence and against her will, and that said Annie Patt was a female, and at said time was not the wife of the defendant, James Harmon, then and in that event you should find the defendant guilty as charged in the indictment. But in order to convict the defendant, the Territory must also establish by the degree of evidence stated in these instructions, that the said prosecuting witness resisted to her utmost capacity, and that her resistance was overcome by force and violence. On the other hand, if you should entertain a reasonable doubt as to whether the defendant, James Harmon, accomplished an act of sexual intercourse with the prosecuting witness, Annie Patt, as charged in this indictment and as defined in these instructions, you should return a verdict of not guilty."

We think the foregoing instruction correctly stated the law. This disposes of the first and second grounds of the objection to the instructions of the court.

The third objection has heretofore been fully considered in this opinion.

The seventh ground for reversal contended for by counsel for defendant, to wit, that one of the jurors took notes of the evidence during the trial, and notwithstanding the admonition of the court such juror used the said notes in the jury room while they were deliberating upon their verdict, is not supported by the evidence taken upon a motion for a new trial.

One J. H. Gill, a juror was called as a witness on the motion for a new trial touching this question and being questioned by the court answered as follows:

"Q.   Do you recall the particular point on which he referred to his note book?

"A.   Yes, sir.

"Q.   Did you agree with him that his statement was correct?

"A.   Why, I just heard what—there was nothing—shall I state just what it was?

"By the court: No, just answer my question; did you all agree with him, with his statement of what the evidence was on the trial?

"A.   Why, I don't think it was with reference to any thing connected with the evidence at all."

It is thus not apparent that the note book was one made use of by the juror on the trial, or that it contained anything relating to the trial, or that the jury were in any way influenced by the note book, or anything in it.

We find no error in the proceedings in the court below, and the judgment and sentence of the trial court is therefore affirmed.

Burwell, J., who presided in the court below, not sitting; Beauchamp, J., absent: all the other Justices concurring.