AUBREY LEE NICKELS, *Plaintiff in Error*, v. THE STATE OF FLORIDA, *Defendant in Error*.

Opinion Filed December 1, 1925.

En Banc.

1. An extrajudicial confession is admissible in evidence when it is freely and voluntarily made by the accused and is uninfluenced by any threat, promise, fear, hope or other illegal inducement, even though the accused be under arrest and in prison at the time and such confession be made to the officer having the accused in custody.

2. Before an extrajudicial confession is admitted in evidence, it should appear *prima facie* that the confession was uninfluenced by any illegal inducement and was in fact freely and voluntarily made.

3. The admissibility of an extrajudicial confession is to be determined solely by the trial judge, in the absence of the jury,

as a mixed question of law and fact, from a preliminary consideration of the evidence offered by either party bearing upon the circumstances under which the confession was made.

4. When admitted in evidence, the credibility of a confession is for the jury to determine, but all confessions should be acted upon by both court and jury with great caution.

5. While the circumstances which constitute improper influences, such as will exclude confessions, create questions of law which may be reviewed by an appellate court, the *credibility* of the testimony to prove the circumstances, including conflicting testimony, is primarily a question for the trial court, and not reviewable by an appellate court unless the court below has transcended its discretion and a wrong may have been done thereby.

6. It is not essential to the admissibility in evidence of an extrajudicial confession that it be the spontaneous utterance of the accused. The fact that such confession was obtained by questioning the accused will not alone exclude it, even though some of the questions be leading and assume guilt, if the confession in fact emanates from the free will of the accused and is unaffected by any illegal influence.

7. When considering a confession obtained by questioning the accused, trial courts should exercise great diligence to ascertain whether such questioning was so repeated and persistent and applied under such attending circumstances of intimidation or inequality between the interrogator and the accused as to impair the freedom of will of the latter and thereby amount to compulsion.

8. In considering the admissibility of an extrajudicial confession, the effect as well as the form of any apparent compulsion should be carefully weighed and considered, for a confession obtained by compulsion must be excluded, whatever may have been the character of the compulsion.

9. In a prosecution for crime, the *corpus delicti* may be proven as well by circumstances as by direct evidence, although the probative deficiencies which sometime inhere in circumstantial evidence should be borne in mind.

10. The *corpus delicti* need not be proven beyond a reasonable doubt as a prerequisite for the introduction in evidence of a confession of the accused. That degree of proof, though requisite to a conviction, is not a prerequisite to the admission of the confession.

11. In a prosecution for rape certain evidence examined and found sufficient to *prima facie* establish the *corpus delicti* as a prerequisite to the admission in evidence of a confession of the accused.

12. In a prosecution for rape, testimony of a physician upon the question of penetration, although desirable, is not indispensable.

13. Generally, it is harmful error to admit evidence of other or collateral crimes independent of and unconnected with the crime for which the defendant is on trial. To this general rule, however, there are several distinct exceptions, amongst which are that such evidence is admissible when it is relevant as a part of the *res gestae*, or tends to establish the adentity of the person committing the crime laid in the indictment. or where it is impossible to give a complete or intelligent account of the crime charged without referring to the other crime.

14. In a prosecution for rape, testimony as to the general reputation of the prosecutrix for chastity is admissible only for the purpose of showing a probabliity of her consent to the act charged. Such testimony is material only when the defense interposed at the trial involves a claim of present consent by the prosecutrix to the act charged in the indictment.

15. In a prosecution for rape, evidence of the general reputation of the prosecutrix for chastity does not extend to or affect her general credibility as a witness, nor is it competent as a substitute for or in lieu of testimony as to her general reputation for truth and veracity.

16. The proper foundation having been previously laid on cross examination, prior inconsistent statements made by a witness produced by the opposing party relative to matters material

to the issues in controversy are admissible in contradiction of his testimony at the trial, unless the witness distinctly admits having made such statements. Such testimony goes to the credibility of the witness.

17. The foundation for the impeachment of a witness produced by the opposing party is sufficiently laid when the circumstances of the supposed inconsistent statement are so designated that the attention of the witness sought to be discredited is fairly called to the time and place of the supposed statement and the person or persons to whom it was made in such manner that the witness can not be taken by surprise but is afforded ample opportunity to refresh his memory and make intelligent answers admitting the inconsistent statements or offering such explanation thereof as he may desire.

A Writ of Error to the Circuit Court for Volusia County; J. J. Dickinson, Judge.

Reversed.

*James H. Bunch,* for Plaintiff in Error;

*Rivers Buford,* Attorney General, and *J. B. Gaines,* Assistant, for the State.

STRUM, J.—Having been adjudged guilty of the crime of rape and sentenced to death, plaintiff in error, hereinafter referred to as the defendant, seeks reversal of the judgment by writ of error.

To a previous judgment of conviction and similar sentence which followed a former plea of guilty, a writ of error *coram nobis* was denied by the circuit judge. On writ of error, the order of the circuit judge denying a writ of error *coram nobis* was affirmed by this court; but on a rehearing subsequently granted the order was reversed. See Nickels v. State, 86 Fla. 208; 98 South. Rep. 497, 502; 99 South. Rep. 121. A new trial followed, resulting in the judgment of which the defendant now seeks a reversal.

The offense of which the defendant was convicted was committed in the city of DeLand on December 7, 1921. When attacked, the victim resisted her assailant with the utmost vigor and determination and a violent struggle between them occurred in the bath room of the victim's home, in which room the actual attack was precipitated and consummated. The testimony indicates that the victim was wearing, among other things, two rings. During the course of the struggle, the assailant forcibly removed one of these rings, but was unable to remove the other, a wedding ring. The struggle continued unabated until unconsciousness on the part of the victim intervened as her assailant was about to consummate his carnal attack upon her. Immediately after the accomplishment of the latter purpose and while the victim lay upon the bath room floor, her hands bound by a towel, her assailant visited other parts of the house where he procured several other articles of jewelry and personal paraphernalia. After thus occupying himself for about ten minutes he returned to the bath room where the victim still lay, and after speaking briefly with her there, fled the scene. The perpetrator of the offense escaped apprehension at that time.

On December 12th, 1921, the defendant was arrested in Jacksonville as he was leaving a pawn shop, suspicion having attached to him by reason of his possession of the jewelry and other articles taken from the person and home of the victim at the time of the attack upon her. The defendant was lodged in the city jail in Jacksonville, and on December 14, 1921, was visited in his cell there by an attorney at law, an official court reporter, the chief of police, assistant chief of police and keeper of the city jail of Jacksonville.

The following colloquy then occurred between the attorney and the defendant, in the presence of the other persons mentioned, the attorney asking the questions, the defendant

answering them, as hereinafter indicated, and the official court reporter taking down all that was said by either the said attorney or the defendant. The others present said or did nothing with the exception of the reporter, who asked the defendant how he spelled his name. At the time, the defendant was under arrest, and suspected of but not yet actually charged with or indicted for the crime above mentioned: Q. (by the attorney) "You are under arrest here by the Police Department, and you are going to be charged with rape. We want to know if you want to make a statement as to what you did, and with the understanding that you are not compelled to make any statement unless you want to. It is entirely optional with you. We want you to understand that you have the privilege of refusing to make any statement if you want to. If you do make a statement, it will be used against you in the event that you are indicted by the Grand Jury of Volusia County, charged with rape, when you are given a trial upon that charge in that county. Do you want to make a statement?" A. (by the defendant) "Well, yes, sir, I can do it, sir, if you want me." Q. "All right; I want you to tell the Chief of Police here; this is a deputy court reporter of the Fourth Judicial Circuit, and Mr. Kirby Poster, Jailer, and my name is W. A. Hallowes, Jr. With that understanding from you that you are willing to make the statement, we want you to tell us just exactly what occurred; what you did down in DeLand, starting from the beginning of it, right on through." A. "Well, when I was in DeLand, I was only there for a short while and I asked a gentleman where I could get a sporting woman. He said he would get me one for two dollars. I told him I didn't have the money. And I had about a dollar and eighty cents, something like that, and he says, 'Well, give me a dollar and I'll show you where her house is.' So, he carries me to this house and I gave him the dollar. He told me to go in as a plumber. So, I did. I

had never seen this woman before. So, when I went in, I cut her water and I left her house and I went to find this fellow and he couldn't be found. So, I went back to this house. I went in the bath room, and she was telling me about some water that kept running and I tried to fix it for her. And she came in the bath room the first time and talked to me, and then went out. And then she came back the second time, and I grabbed her and she screamed; and she told me to quit, said her mother-in-law lived next door. And she called for her mother-in-law again. I threw her down. And then she told me, she says, 'Well, it's up to you, I will let you go your way.' " Q. "What did you do?" A. "Well, I jazzed her." Q. "By that, do you mean you had carnal intercourse with her?" A. "Yes, sir." Q. "Did you have sexual intercourse with this woman?" A. "No, sir." Q. "What did you mean by the remark that you had carnal intercourse with her; what do you mean?" A. "Well, I had an intercourse with her, sir. That's what I mean." Q. "You had sexual intercourse with this woman." A. "Yes, sir."

Replying to a series of further questions by said attorney the defendant then related in detail how he grabbed his victim and threw her down, striking her several times with his fist when she screamed; the details of his carnal attack upon her, repeatedly admitting his carnal intercourse with her; how after accomplishing the latter he tied her hands with a towel so as to keep her in the bath room and give him time to escape, after which he proceeeded to other parts of the house where he obtained the jewelry and some other articles found upon his person when arrested; and how he escaped apprehension and fled from the scene of his crime to Jacksonville. Although the defendant twice stated in the early part of his confession that his victim ultimately yielded after he had struck her several times, the following statements also appear in a subsequent portion thereof: Q.

(by the attorney) "She didn't consent to you having intercourse with her?" A. (by the defendant) "No, sir." Q. "You did this against her will? I want you to tell the truth about this thing." A. "Yes, sir, I am telling the truth." Q. "Did you have intercourse with her against her will?" A. "Why, yes, sir, I suppose so." Q. "You know whether it was or not?" A. "I asked her and she said no, her mother-in-law lived next door." Q. "Did you have intercourse with this woman against her will?" A. "Yes, sir." Q. "She did not consent for you to have intercourse with her?" A. "No, sir." Still later in the confession the following appears: Q. "Do you fully realize the enormity of this offense you have committed?" A. "Yes, sir, Cap." Q. "What is that?" A. "Yes, sir." Q. "You fully realize what you have done; is that right?" A. "Why, yes, it's pretty bad, sir." Q. "And you make this statement to us freely and voluntarily, do you not?" A. "Yes, sir." Q. "Nobody has intimidated or threatened you at this police station, have they?" A. "No, sir, no one whatever." Q. "Nobody has offered you any inducement whatever to make this statement, have they?" A. "No, sir." Q. "What you told the police officers here and now is done freely and voluntarily?" A. "Yes, sir." Q. "Of your own free will and accord?" A. "Yes, sir." Q. "Without any inducement or hope of reward being held out to you at all?" A. "Yes, sir." * * * Q. "And at no time did she consent for you to have intercourse with her?" A. "No, sir."

When the defendant's confession so obtained was offered in evidence at the trial, the defendant objected to the same as a whole, severally objected to each component question and answer, and after admission of the confession in evidence moved to strike the same on divers grounds which may be summarized as follows:

(1) Because the confession was obtained through a series

of leading questions, some of which inferred guilt, and was otherwise involuntarily made.

(2) Because the confession was made through a sense of fear and was influenced by inducements and hope of reward.

(3) Because no sufficient warning was given to the defendant before the confession was made.

(4) Because the *corpus delicti* had not been proven by other evidence before the admission in evidence of the confession.

The defendant also urges that certain questions and answers contained in the confession relating to the taking of the jewelry and other articles from the person and home of the victim, and to the possession of these and other articles by the defendant at the time of his arrest were inadmissible in evidence as a part of the defendant's confession, because the same relate to the commission by the defendant of a crime or crimes other than that for which he was upon trial.

The trial court overruled all objections to this confession, and admitted the same in evidence, further overruling the motion to strike the same. This action of the trial court is assigned as error.

The first three objections to the confession involve closely related questions of law, and we will therefore consider them together. The confession in question is extra-judicial. Such a confession is admissible in evidence when it is freely and voluntarily made by the accused and is uninfluenced by any threat, promise, fear, hope or other illegal inducement, even though the accused be under arrest and in prison at the time and such confession be made to the officer having the accused in custody. Green v. State, 40 Fla. 191, 23 South. Rep. 851; McNish v. State, 47 Fla. 69, 36 South. Rep. 198; Sims v. State 59 Fla. 38, 52 So. Rep. 198, Williams v. State 48 Fla. 65, 37 South. Rep. 521; Moore v. State, 68 Fla. 91, 66 South. Rep. 431; McDonald

v. State, 70 Fla. 250, 70 South. Rep. 24; Davis v. State decided at this term. That the confession was in fact so made should appear *prima facie* before it is admitted in evidence. Statements made by the accused as a part of the confession with reference to its voluntary character, while pertinent, are by no means decisive of the matter. The question is to be determined solely by the trial judge, in the absence of the jury, as a mixed question of law and fact, from a preliminary consideration of the evidence offered by either party bearing upon the circumstances, conditions and surroundings under which the confession was made, which may include evidence of the age, sex, disposition, experience, character, education, intelligence, previous training, and mental condition of the accused, bearing in mind that all confessions should be acted upon by both court and jury with great caution. Coffee v. State, 25 Fla. 501, 6 South. Rep. 493, 23 Am. St. Rep. 525. When admitted, the credibility of the confession is for the jury to determine. Holland v. State, 38 Fla. 178, 22 South. Rep. 298; Bates v. State, 78 Fla. 672, 84 South Rep. 373.

When it is made to appear *prima facie* by the State that the confession was made in conformity with the rule above stated, the burden is then upon the defendant to show that it was in fact not a voluntary confession. Sims v. State, 59 Fla. 38, 52 South Rep. 198. In considering whether the confession is voluntary, the trial judge must of course, determine the fact even upon conflicting evidence, and when we are called upon to review his ruling upon such evidence, we must accord to his finding the presumption that it is correct. What circumstances constitute improper influence such as will exclude confessions, are questions of law which may be reviewed by an appellate court, but the credibility of the testimony to prove the circumstances, as well as the credibility of conflicting testimony, are primarily questions for the trial court, not reviewable by us, unless the court

below has clearly erred in its conclusion of facts, or, as expressed by this court in Coffee v. State, 25 Fla. 501, text 514, 6 South. Rep. 493, 23 Am. St. Rep. 525, unless the court below "has transcended its discretion and a wrong may have been done thereby." Holland v. State, 39 Fla. 178, 22 South. Rep. 298; Thomas v. State, 58 Fla. 122, 51 South. Rep. 410; Davis v. State, decided at this term.

The law is well settled that when an extra judicial confession is made in conformity with the rule above stated it is admissible, though it may not be the spontaneous utterance of the accused. The fact that the confession was obtained by questioning the prisoner will not alone exclude it, even though some of the questions be leading and assume guilt, if the confession in fact emanates from the free will of the accused and is without inducement of hope, fear or other illegal influence. Davis v. State, decided at this term. See also Ziang Sung Wan v. United States, 266 U. S. 1,— Sup. Ct. Rep. —, decided October 13, 1924; Underhill's Crim. Ev. (3rd ed.) 352; Curry v. State, 203 Ala. 239, 82 South. Rep. 489; State v. Penney, 113 Iowa 691, 84 N. W. Rep. 509; Young v. State, 90 Md. 579, 45 Atl. Rep. 531; State v. Priest, 117 Me. 223, 103 Atl. Rep. 359; State v. Barrington, 198 Mo. 23, 95 S. W. Rep. 235. A mild degree of persistency in such questioning is sometimes sanctioned. People v. Simsen, 153 Cal. 387, 95 Pac. Rep. 863; State v. Banneik, (N. J.) 64 Atl. Rep. 994. When considering such a confession, however, trial courts should exercise great diligence to ascertain whether such questioning was so repeated and persistent and applied under such attending circumstances of intimidation or of inequality between the interrogator and the accused as to impair the freedom of will of the latter and thereby amount to compulsion. The effect as well as the form of the compulsion should be carefully weighed and considered, for a confession obtained by compulsion must be excluded, whatever, may have been the

character of the compulsion. Ziang Sung Wan v. United States, 266 U. S. 1,—Law Ed.—, decided October 13, 1924. But there is a clearly existing distinction between the repeated and persistent questioning which may render the resulting confession inadmissible, and a series of questions, calmly and fairly propounded and readily answered. The former is a persistent repetition of questions directed to substantially the same matter, which especially when addressed by a strong and vigorous man to a weaker one in adverse circumstances, may impair the mental freedom of the latter so as to constitute compulsion. The latter merely elecits the connected recital of a sequence of events. The statement to the defendant, in the early part of the confession, "All right, I want you to tell the Chief of Police here, * * * we want you to tell us just exactly what occurred; what you did down in DeLand, starting from the beginning of it, right on through," when taken in connection with the attending circumstances of this confession, does not render the confession involuntary (State v. Blodgett, 50 Ore. 329, 92 Pac. Rep. 820; Sparf v. United States, 156 U. S. 51, 39 L. Ed. 343, 15 Sup. Ct. Rep. 273), although such a statement, spoken threateningly or menacingly as a demand might amount to compulsion, especially when made under circumstances which import actual or apparent danger to the accused.

When the confession now under consideration was offered in evidence by the State, the jury was excluded while the court heard evidence of the State and defendant upon the admissibility thereof. The reporter who stenographically transcribed the confession identified the defendant as the person answering such questions at the time, and place above mentioned and testified that he was present during the entire interview; that no inducement whatever was held out to the defendant in the presence of the witness to cause him to make any reply to any questions propounded to him;

that the defendant was told that it was entirely optional with him (the defendant) as to whether or not he made a statement; that he (the defendant) had the privilege of refusing to make any statement if he wanted to; that if the defendant made any statement it would be used against him in the event he was charged with or indicted for rape; that the defendant was not handcuffed, but was sitting in the jail in the presence of the officers, that the defendant made no statement at that time to the effect that he was in danger of mob violence or of being lynched; that the question of mob violence was not raised at any time during the interview; that he observed the demeanor of the defendant to a considerable extent; that he appeared to be perfectly calm; that he hesitated at one or two points in his testimony (confession), but the majority of it was readily and steadily enough given; that on the whole it did not appear to the witness that the statement might have been from any cause other than the free volition of the defendant; that the witness took down in shorthand and transcribed the exact words and language of the defendant at that time; and that the transcript which the witness then produced was a true and correct thanscript of the words and statements that the defendant made at that time.

To rebut this testimony, the defendant himself took the stand and testified that he was 23 years old on the 22nd of November, 1923, that he recalled making the statement or confession referred to some two or three days after his arrest; that before making that statement he had previously talked to other persons in the city jail about the crime; that these other persons had questioned him as to whether he had been to DeLand, in reply to which he admitted he had been there; that these other persons then told him that the authorities of Volusia County were looking for him and that there was a warrant there for rape; that they asked him whether he knew it and he

told them he did; that after asking him a number of other questions, these persons finally told him (the defendant) that they wanted the truth of this thing, and if he would tell them the truth they would see that no mob would get him, and that his life was also in danger, but they would see that he wasn't hanged; that he could not get the death penalty if he would come on and stick to the words these persons told him, with which advice he complied; that if he (the defendant) obeyed their advice they would look out for him and see that he was protected although the feeling against him in Volusia County was very high. The defendant further testified that a man named Robinson told him on the streets in DeLand on the afternoon of the crime that the whole city of DeLand was looking for him and that there was a warrant out for him; that Robinson secreted the defendant in the former's place of business until that night, when Robinson took the defendant to Sanford, where the latter caught a freight train to Jacksonville; that after he arrived in Jacksonville, he read in a Jacksonville paper dated December 8th, 1921, an account of the offense which said that a hundred men were combing the woods for the perpetrator thereof and that feeling was running high against him; that the men previously mentioned as having visited him in the city jail visited him there the night preceding the afternoon when he made the confession offered in evidence; that he had never seen the men before and did not know their names; that he did not want to make the statement to Mr. Hallowes, but did so for the reason that his life was in danger and that he had been told by these strangers who visited him that if he made the statement and stuck to it they would not permit him to hang and they would not let any one bother him. The defendant further testified that something was said to him about the feeling

against him, but not by Mr. Hallowes, the attorney to whom he made the confession; and that he did not make the statement to Mr. Hallowes freely and voluntarily, but from a sense of fear. When cross-examined by the State's Attorney, however, the defendant freely admitted that Mr. Hallowes cautioned and warned him as hereinabove quoted, and further admitted that he made the statements to Mr. Hallowes, which are quoted hereinabove, relating to the voluntary character of the confession.

The Chief of Police of Jacksonville then testified, when called by the State, that he was present at the time of the confession; that the defendant had been in jail "a couple of days"; that to the knowledge of the witness no unknown persons had been admitted to the city jail for the purpose of interviewing the defendant and that so far as he knew no one other than the subordinate officers at the jail, and Mr. Hallowes, had had any conversation with the defendant; that it was possible that some one might have come there and gotten permission from the Inspector in charge to see the defendant, but that such was not the case to the knowledge of the witness; that Mr. Hallowes cautioned the defendant that what he said would probably be used against him, asking the defendant if he wished to make any statement, to which the defendant replied that he did; that the defendant was advised that he did not have to make the statement unless he wanted to, it being entirely optional with him; that the defendant then made a statement during which he was perfectly calm, cool and collected; that he did not seem to be nervous and made "as straight forward a statement as any man I (the witness) had ever talked to," appearing to be composed, cool, calm and natural; that the defendant first had his head down in a kind of deep study and then raised his head up and told them all about it; that at the end of

the statement he told Mr. Hallowes he had made it freely and voluntarily, of his own will and accord and uninfluenced in any way.

The confession was made on December 14th, 1921, one week after the commission of the crime to which it relates. The accused was then safely incarcerated in the city jail at Jacksonville, where he had remained for two days without any display of violence toward him. The place of the confession was more than one hundred miles from the scene of the crime, in a large and populous city with ample facilities for the preservation of safety and good order. The defendant admits that nothing was said or done to him at the time of the confession which was at all calculated to put him in fear or excite any hope of his escaping punishment, nor does he claim that anything which occurred prior to the confession had such effect upon him, except the statements claimed by the defendant to have been made to him by Mr. Robinson, the news item in the newspaper of December 8th, 1921, and the statements of the unknown persons whom the defendant claims visited him in his cell. The Mr. Robinson referred to by the defendant testified that he knew the defendant only as a casual customer who had been eating for three or four days at his (witness') lunch counter, and flatly denied all the actions and statements attributed to him by the defendant, in which denial he was substantially corroborated by other credible witnesses subsequently testifying. The newspaper article discloses no more than that a supposed mob of one hundred citizens were searching for the perpetrator of the crime on December 8, 1921, six days prior to the confession near DeLand,—more than one hundred miles from the scene of the confession, and that the citizens of DeLand were aroused to a high pitch, lynching being feared if the perpetrator was apprehended, knowledge of which did not, however, prevent the defendant from going upon the

public streets of Jacksonville, where he was arrested in an orderly and lawful manner. There was no confirmation of the existence in fact of the reported mob, and no claim of its presence within one hundred miles of the defendant at the time of the confession or at any other time. The defendant does not claim that there had been the slightest overt act of violence, nor any specific threats thereof, and the complete absence of such is amply established. There is much of inherent improbability in the defendant's testimony concerning the visit of the unknown persons to his cell previous to the confession, as well as a total lack of corroboration thereof. Assuming, however, that such visit may have occurred, the situation of safety, both actual and apparent, in which the accused found himself at the time of the confession, his remoteness both from the scene of the crime and from the locality of the reported mob, the lapse of time (six days) since the reported formation of the mob, the utter lack of confirmation of its existence in fact, the time afforded the defendant for mature reflection, and the admitted absence of any threats or overt acts of violence, compulsion or restraint, when taken together with the plain statements as to his privilege, hereinabove quoted, made the defendant by Mr. Hallowes, were sufficient, in the absence of any showing to the contrary other than the unsupported statement of the accused made for the first time nearly one year thereafter, to completely remove and dissipate the effect of any prior illegal inducement, compulsion or influence, real or fancied, engendered in the mind of the defendant either by the visit of the unknown strangers if such in fact occured, the information disclosed in the newspaper published six days before the confession, or the statements said to have been made to the defendant by Robinson seven days previously. At the time of the confession the accused was

in no physical or other danger, either actual or apparent, nor was the situation as it is disclosed to us by the record such as to reasonably lead him to apprehend danger or to create in his mind such a fear as would amount to an improper influence upon him. Green v. Commonwealth, 26 Ky. Law Rep. 1221, 83 S. W. Rep. 638; State v. Jones, 46 La. Ann. 1395, 16 South. Rep. 369; Simmons v. State, 61 Miss. 243; State v. Patterson, 73 Mo. 695; State v. Howard, 17 N. H. 171; State v. Fisher, 6 Jones' Law (51 N. C.) 478; Commonwealth v. Sheets, 197 Pa. 69, 46 Atl. Rep. 753; Young v. State, 50 Ark. 501, 8 S. W. Rep. 828; Smith v. State, 74 Ark. 397, 85 S. W. Rep. 1123; Hardy v. United States, 3 App. Cas. D. C. 35; United States v. Nardello, 4 Mackay (D. C.) 503; State v. Foster, 136 Iowa 527, 114 N. W. Rep. 36; State v. Stuart, 35 La. Ann. 1015; State v. Wilson, 36 La. Ann. 864; State v. Grover, 96 Me. 363, 52 Atl. Rep. 757.

At no time did the interrogator of this defendant "repeatedly question" the latter in such manner as to render the statement doubtful in respect to its voluntary character. He simply propounded in an orderly and normal manner a series of questions which the defendant voluntarily answered.

There is no intimation that the accused was in the least degree affected by weariness or fatigue resulting from the questioning. The length of the confession indicates that it could have been fully made, in the form in which we find it, within thirty to forty minutes.

The confessions excluded in the cases of Gallaher v. State, 40 Tex. Cr. Rep. 296, 50 S. W. Rep. 388, and Parker v. State, 46 Tex. Cr. Rep. 461, 80 S. W. Rep. 1008, cited by the defendant both of which are Texas cases, were obtained, respectively, under materially different circumstances, and as a result of a much more rigorous and

persistent cross examination, than the defendant's con-. fession in this case.

A thorough consideration of all pertinent facts and circumstances in connection with the confession convinces us that it was freely and voluntarily made and that no improper influences were exerted to induce it.

The next objection to the admission of the confession is that the *corpus delicti* had not been proven by other evidence before the admission in evidence of the confession. The *corpus delicti* may be proven as well by circumstances as by direct evidence. Holland v. State, 39 Fla. 178, 22 South. Rep. 298; Gantling v. State, 41 Fla. 587, 25 South Rep. 737; People v. Scouten, 130 Mich. 620, 90 N. W. Rep. 332; State v. Carnagy, 106 Iowa 483, 76 N. W. Rep. 805; Taylor v. State, 111 Ind. 279, 12 N. E. Rep. 400. In considering the sufficiency of circumstantial evidence the probative deficiencies which sometimes inhere in that class of testimony should be borne in mind. The *corpus delicti* need not be proven beyond a reasonable doubt as a basis for the introduction of a confession of the accused. That degree of proof, though requisite to a conviction is not a necessary prerequisite to the admission of the confession. If, when the confession is offered, there be already before the jury evidence tending to show that the offense to which the confession relates has been committed, the court should admit the confession, if it is free and voluntary and otherwise admissible, the court deciding in the first instance whether the evidence of the *corpus delicti* is *prima facie* sufficient to authorize the introduction of the confession in evidence. Holland v. State 39 Fla. 178, 22 South. Rep. 298; Parrish v. State,—Fla.—, 105 South. Rep. 130; Tucker v. State 64 Fla. 518, 59 South. Rep. 941.

Prior to offering the confession in evidence, the State offered the following testimony upon the *corpus delicti*:

.The mother-in-law of the victim testified that she lived next door to the house of the victim at the time of the commission of the crime; that she heard the victim call feebly for her, and knew something was wrong; that she went over to the victim's house and found the latter in her bed room all bruised and bloody, and tied up with bath towels and hose around her feet, ankles, legs and arms; that the victim's head was beaten, bruised and split, her eyes black and blue and her throat blue and bruised; that her thighs had the print of a man's hand all over them, there was blood all over head and body and her clothes dirty and torn. The witness further testified as follows: "I found her in very bad condition. She was all bruised and bloody. And .I wiped her, and helped my son wipe the stuff from her. (Indicating)."

Q. "Helped your son wipe the stuff from her. What kind of stuff was that?" A. "I can't think of what you call it." Q. "Where was this stuff?" A. "All around her legs and vagina." Q. "You helped your son wipe it?" A. "My son." Q. "That is her husband, Ben?" A. "Ben, that is her husband." Q. "Was the stuff semen?" A. "Sure, that is it." Q. "Is that it?" A. "I helped wipe it with my son." Q. "It was where?" A. "All down (indicating)." Q. "In between her legs?" A. "Yes sir." Q. "Did you see any of it in the vagina?" A. "I did." Q. "And you wiped it out?" A. "I did, with the help of my son."

The victim's husband testified that he arrived on the scene about two minutes after receiving the report of the assault upon his wife, that he arrived as his mother and a negro servant were trying to get his wife on the bed. His testimony as to the physical condition of his wife was substantially the same as that of his mother. He further testified that his wife was nervous and excited and some-

times she would talk sensibly and sometimes she wouldn't.; that after attending to his wife he went into the bath room and "found a pool of blood on that side (indicating), on the north side of the bath room, between the lavatory and the bath tub. It must have been a half inch deep up next to the baseboard on that side of the room. And it ran out, oh, fully two feet from the wall, and about four feet aside the wall. And the print of her head was in the clotted blood. And the rug was throwed up, you know, just looked like a row had been in there; and towels scattered around; and the toilet broke, and the water shut off, and the window down." This witness further testified. Q. "I want you to tell me both what you saw and what was done, with reference to any mess and corruption you refer to." A. "You see we tried to get her cleaned up the best we could for the doctor to come. She was bloody and bruised and dirty. And we took her clothes and a towel, after we took her clothes off, and put her in a night dress—I took her underclothes myself, and so did my mother, and wiped the semen from the inside of her legs, and out of her vagina, and wiped the blood off of her, and her clothes too, and put her in a night dress. Then about the time we got her in this, I don't think we had hardly got it done, before the doctor came." Q. "You say you removed semen from the vagina?" A. "Absolutely, yes sir." Q. "From the inside of the vagina?" A. "Yes sir." Q. "From the lips of the vagina?" "Yes sir." You swear to that to this jury?" A. "Yes sir. I done it myself. I know it."

One of the attending physicians, Dr. Taylor, testified that he was called to the victim's house between three thirty and four o'clock on the afternoon of the assault; that "she seemed to be in quite a good bit of shock. She had two wounds on the head, as well as I recall. There

was one temple wound there (indicating) and one wound back here (indicating), I think, on the right side. I am positive there were two wounds on the head of Mrs. Moore. And they were rather serious wounds. There was a great deal of bleeding. The hair was all matted. There was a blue place on the right eye, under the right eye, and one breast was bruised. That was what I found on the first examination;'' that he made a vaginal examination about thirty-five minutes or an hour later, saying: ''I made the usual vaginal examination, and a microscopical examination of the contents of the vagina. That is obtained by dilating the vagina, and with the speculum and with a swab, and through the speculum, into the vault of the vagina, and get the contents, and it is placed on a slide, and you examine it. And the remainder of the examination was simply visual, looking for injuries.'' That he found no vaginal bruises or wounds, the vaginal condition being one of general relaxation due to the fact that the victim had recently given birth to a baby. On cross-examination the witness further testified: Q. ''Did you find, as a result of that examination any semen from a man?'' A. ''Well, I did't find any spermatozoa. But, in passing— ''Q. ''What is that?'' A. ''The spermatozoa—the semen itself would be unrecognizable under the microscope. The spermatozoa is the seed itself. The semen is the secretion as well as the seed. And every once in so often, it happens that a man is sterile, and has no spermatozoa. And in an event like that, the examination would not show up. The semen would not show under the microscope at all. You can only recognize the seed itself.'' Q. ''Did you find any—'' A. ''I did not find any spermatozoa in the vault of the vagina. I did not find any spermatozoa from the specimen I examined. This specimen was obtained from the vault of the vagina. By that I mean that part

of the vagina lying next to the womb, and about three inches, as a rule I should say, two to three inches from the entrance of the vagina. You see the plates of the specalum separated the vagina; and even had there been spermatozoa at the outlet, I wouldn't have located it with this examination. I simply examined the secretions, or semen, as we call it, from the upper reaches of the vagina." Q. "Now then, you did not find any of this vital seed from the man as a result of your examination, with your microscope? Is this true?" A. "I did not." Q. "Doctor, what did you find to indicate that a man had held intercourse, if anything?" A. "Well, I didn't find any evidence of the fact that intercourse had been had. But I think this should be brought out too: At that time, that the young lady, with a relaxed vagina, etc. intercourse might have been had, could easily have been had, without leaving any evidence whatsoever. There were no bruises. Naturally, there was no vaginal secretions, which only comes when there is inflammation on the part of the woman; and the nervous condition was such that the vagina and the parts were all relaxed; and intercourse, as I said a minute ago, could have been had, in my opinion, without leaving any evidence I could discover at that time. Like you were putting your finger in your mouth, and pulling it out: You don't know whether it was in there or not. With a relaxed vagina, entrance could have been had without any bruising. So, I think both sides of that— while I did not find evidence of injury, the mere fact that no injury was present, does not make me personally believe that entrance was not had. Is that plain?" Q. "That's what I said, Doctor; did you find any evidence, positive evidence, of intercourse with a man, as the result of your examination of this vagina?" A. "I found no evidence, no positive evidence. And yet, if intercourse

had been had there would have been no positive evidence, aside from the possibility of finding the spermatozoa we spoke of awhile ago.'' Q. ''Doctor, if she had had intercourse with a man in a usual and natural way, with a normal man, would you not have likely have found, as a result of this microscopical examination''——— A. ''If spermatozoa had been deposited in the vault of the vagina, I would very likely have found them.'' Q. ''Isn't that the place where they would have been deposited if she had intercourse in a usual and natural way.'' A. ''In a usual and natural way, and if the penis penetrated, that is the place where it would have been positive; that is, if it had penetrated for a distance of two or three inches; but, just within the vagina, is what we call the constrictive vaginal muscles. In my opinion, if semen were deposited on the outside of the constrictive muscles, it would, when the woman is sitting in an upright position, run out, run back down over the parts, and over the thighs of the woman. If it were deposited on the inside, when she assumes an upright posture, this constrictive vaginal muscle would tend to hold it in. That seems to be nature's way of holding it back. So, with normal intercourse, if ejaculation took place on the inside of this constrictive muscle, and spermatozoa were present in the semen, why, the microscopic examination would show them up. If semen were deposited on the outside, the microscopical examination of the vault of the vagina would be negative.'' Q. ''Did you find any indications of semen or spermatozoa being deposited on the outside?'' A. ''Did not.'' Q. ''Of these muscles?'' A. ''I did not.'' Q. ''Did not?'' ''And from what you found, Doctor, as a result of your examination, isn't it as likely that she did not have intercourse with a man, as that she did have intercourse with a man from what you found?'' A. ''Mr. Bunch, from what I found, it was absolutely negative; may have had or may

not have had, and either one of them would have left no signs. Well, taking everything into consideration, all the wounds and surroundings, and the shock, and all those things, it is my opinion that she was raped.''

The victim herself positively identified the defendant as her assailant, and further testified that he gained entrance to her house through the pretence that he was a plumber who had come to shut off the water on account of some work then being done on the mains; that at his request she accompanied him to the bath room where he attacked her, striking her several times when she resisted and screamed for help, using his fists and the butt end of a revolver; that he forcibly took a ring from her finger, after which he forcibly threw her down and got astride her and as he was about to consummate his carnal attack she fainted from the effects of a blow by the defendant, having previously resisted the attack as long as she could; that when she regained consciousness she was tied with several pieces of hose belonging to certain bath room accessories; that her clothes were all torn and severely disarranged and up around her waist; that her hair was down and lying in a pool of her own blood on the bath room floor; that when she got up she was all wet and slimy ''with semen that was running from my vagina.'' That at the time the defendant was in the dining room rummaging through the silver, from which he proceeded to the back bed room where he pulled out the dresser drawers where some of her jewelry was kept; after which he returned to the bath room door, spoke to her about her baby and departed. The witness further testified: Q. ''Now, have you told this jury, Mrs. M——— the manner in which this affair happened?'' A. ''Yes sir.'' Q. ''I will ask you this question Mrs.———; Did this defendant, Aubrey Lee Nickels, have intercourse with you?'' A. ''Yes

sir." Q. "Did you at any time give your consent?" A. "No sir." Q. "To what extent did you resist? A. "I fought him just as long as I was conscious." On cross examination the victim further testified: Q. "Mrs. M— up until the time that he knocked you unconscious, he had not had any sexual intercourse with you before?" A. "No sir." Q. "After you regained your consciousness, he did not have any sexual intercourse with you, did he?" A. "No sir." Q. "Then you cannot say, while you were unconscious, that he had sexual intercourse with you, can you?" A. "Yes sir." Q. "You can say that?" A. "Yes sir, I know he did." Q. "I see. Now Mrs. Moore, you say that you are certain that he had intercourse with you while you were unconscious?" A. "Yes sir, I am sure of it." Q. "You are sure of that?" A. "Yes, sir." Q. "You just know that?" A. "Yes sir." Q. "You just know that? A. "I am." Q. "And that was because you found something streaming and dripping from your vagina, after you regained your consciousness." A. "Yes sir." Q. "And that is what you base that on?" A. "Yes sir." Q. "And that is all that you base it on?" A. "Yes sir, I think that is enough." Q. "Uh huh. And that's the only reason why you say that he had intercourse with you? A. "Yes sir."

The testimony above quoted, taken as a whole, is amply sufficient to *prima facie* establish the *corpus delicti*, including the element of penetration, as a prerequisite to the admission in evidence of the defendant's confession. Williams v. State 53 Fla. 84, 43 South. Rep. 431; Barker v. State 40 Fla. 178, 24 South. Rep. 69; State v. Carnagy, 106 Iowa 483, 76 N. W. Rep. 105; Bradburn v. State, 162 Ind. 639, 71 N. E. Rep. 133.

The testimony of the physician in this instance is of slight value in determining the question of penetration. But while medical testimony is always desirable, it is not indispensable in establishing that question. Mack v. State,

73 Fla. 476, 74 South. Rep. 522; State v. Cardwell, 90 Kan. 606, 135 Pac. Rep. 597, L. R. A. 1916 B, 745; Mora v. State (Tex. Cr. App.) 167 S. W. Rep. 344; State v. Workman, 66 Wash. 292, 119 Pac. Rep. 751; Harman v. Territory, 15 Okla. 147, 79 Pac. Rep. 765; State v. Bateman, 198 Mo. 212, 94 S. W. Rep. 843; Frazier v. State, 56 Ark. 242, 19 S. W. Rep. 838; Barnett v. State, 83 Ala. 40, 8 South Rep. 612; State v. Lattin, 29 Conn. 389; State v. Ogden, 39 Ore. 195, 65 Pac. Rep. 449. The testimony of the victim corroborated and amplified as it is by that of her husband and mother-in-law, satisfactorily overcomes any deficiencies in the medical testimony.

We now consider those portions of the confession admitted in the evidence relating to the taking by the defendant of the several articles of jewelry and other personal paraphernalia on the occasion of the commission of the crime for which he was on trial.

Evidence that the defendant has committed a similar crime, or one equally heinous, will frequently prompt a more ready belief by the jury that he might have committed the one with which he is charged, thereby predisposing the mind of the juror to believe the prisoner guilty. Generally, therefore, it is harmful error to admit evidence of other or collateral crimes independent of and unconnected with the crime for which the defendant is on trial. Roberson v. State, 40 Fla. 509, 24 South. Rep. 474; Gafford v. State, 79 Fla. 581, 84 South. Rep. 602; 16 C. J. 586; 8 R. C. L. 210.

To this general rule, however, there are several distinct exceptions, well supported by precedent, amongst which are that such evidence is admissible when it is relevant as part of the *res gestae,* or tends to establish the identity of the person committing the crime laid in the indictment or where it is impossible to give a complete or intelligent account of the crime charged without referring to the other crime.

The existing exceptions, however, ought to be carefully limited and guarded by the courts, both in number and in scope.

Supporting the rule and exceptions above mentioned, see Killins v. State, 28 Fla. 313, 9 South. Rep. 711; Oliver v. State, 38 Fla. 46, 20 South. Rep. 803; West v. State, 42 Fla. 244, 28 South. Rep. 430; Ryan v. State, 83 Fla. 610, 92 South. Rep. 571; Wallace v. State, 41 Fla. 647, 26 South. Rep. 713; Roberson v. State 40 Fla. 509, 24 South. Rep. 474; 16 C. J. 609, et seq; Wharton's Crim. Ev. p. 31; Underhill's Crim. Ev. p. 151. See also the exhaustive annotations appended to People v. Molineaux (168 N. Y. 264) 62 L. R. A. 193. Supporting the exceptions as applied to prosecutions for rape, see: People v. Rardin, 255 Ill. 9, 99 N. E. Rep. 59; State v. Taylor (Mo.) 22 S. W. Rep. 806; State v. Taylor, 118 Mo. 153, 24 S. W. Rep. 449; Thompson v. State, 11 Tex. App. 51; Davis v. State, (Tex Crim. App.) 23 S. W. Rep. 685; Parkinson v. People, 135 Ill. 401, 25 N. E. Rep. 764, 10 L. R. A. 91; Oakley v. State, 135 Ala. 15, 33 South. Rep. 23; Harmon v. Territory, 15 Okla. 147, 79 Pac. Rep. 765.

The questioned testimony in this case, most of which is hereinabove quoted, is well within those exceptions to the general rule above referred to. The forcible removal by the defendant of the first ring was a component part of the physical struggle between him and the victum which continued unabated until after the consummation of the carnal attack upon the latter. Immediately thereafter, the defendant busied himself for about ten minutes procuring the articles mentioned from other portions of the house, whereupon he immediately returned to the bath room, where his victim still lay bound upon the floor, and after speaking briefly with her there, he escaped from the scene of the crime. It is clear, therefore, that this testimony was rele-

vant and admissible under each of the exceptions to the general rule above stated.

As against all objections offered to it, the defendant's confession of December 14, 1921, was properly admitted in evidence.

At the trial, the defendant sought to prove by two witnesses the general reputation of the victim for chastity in a community in which she had previously resided, and by another witness such reputation in the community in which she resided at the time of the crime charged. The proffered evidence was excluded and the defendant assigns such action as error. The general rule is that, in prosecutions for rape, evidence of the prior unchastity of the prosecutrix, as a substantive defense, is not adimssible, for rape may be committed upon a woman previously unchaste as well as upon any other female. Where, however, the defense rests upon the fact of consent, evidence of the general reputation of the prosecutrix for unchastity, within recognized limits, is competent evidence as bearing upon the probability of her consent to the act with which the defendant is charged. Such evidence however, must be confined to the general reputation of the prosecutrix for chastity, except that she may be interrogated as to her previous intercourse with the defendant or as to promiscous intercourse with other men, or common prostitution. In the case at bar, the defendant in his confession, made some two years prior to this trial, claimed that on the occasion named in the indictment the prosecutrix ultimately yielded to his demands and that he had intercourse with her by her consent, but the defense interposed by him at the trial was not upon the theory of consent, but was based entirely upon a denial that he either had or attempted carnal knowledge of the victim upon that occasion. Where the sole defense interposed at the trial is a denial of the act of carnal intercourse charged, testimony of the general reputation of the prosecutrix is im-

material because no claim of consent is involved in that defense. Rice v. State, 35 Fla. 236, 17 South. Rep. 286; Tully v. State, 69 Fla. 662, 68 South. Rep. 934. In the Rice and Tully cases, *supra*, the defendant denied that he had previously had any carnal intercourse whatever with the prosecutrix, while in this case the defendant claims to have had carnal intercourse with the prosecutrix, with her consent, on previous occasions, but denies the act of intercourse with which he is charged in the indictment. This circumstance does not alter the rule announced in the two cases last cited, no question of consent to the act charged being involved in this case. State v. Forshner, 43 N. H. 89.

Testimony as to the general reputation of the prosecutrix for chastity is material only when the defense involves a claim of present consent to the act charged in the indictment, because such testimony is adimissible only for the purpose of showing a probability of consent to that act. McQuirk v. State, 84 Ala. 435, 4 South. Rep. 775, 5 Am. St. Rep. 381; State v. Ogden, 39 Ore. 195, 65 Pac. Rep. 449; Shirwin v. People, 69 Ill. 55; State v. Reed, 39 Vt. 417, 94 Am. Dec. 337; Bedgood v. State, 115 Ind. 275, 17 N. E. Rep. 621; Brown v. Commonwealth, 102 Ky. 227, 43 S. W. Rep. 214; 23 Am. & Eng. Ency. Law (2nd Ed) 870. See also note to State v. Roderick, 14 L. R. A. (N. S.) 704 (714) Camp v. State, 3 Ga. 417; 3 Bishop's New Crim-Proc. (2nd ed.) 965; 1 Wharton's Crim. Law. (11th ed.) p. 736; 22 R. C. L. p. 1208, par. 42. It does not extend to or affect her general credibility as a witness, nor is it competent as a substitute for or in lieu of testimony as to the general reputation of the prosecutrix for truth and veracity, Baker v. State, 51 Fla. 1, 40 South. Rep. 673; Commonwealth v. Churchill, 11 Met. (Mass.) 538, 44 Am. Dec. 229; United States v. Masters, 4 Cranch, (C. C. 479, 26 Fed. Cas. No. 15739; Prior v. State, 99 Ala. 196, 13 South. Rep.

681; Spicer v. State, 105 Ala. 123, 16 South. Rep. 706;
Cline v. State, 51 Ark. 140, 10 S. W. Rep. 225; People v.
Yslas, 27 Cal. 631; People v. Whitson, 43 Mich. 419, 5 N.
W. Rep. 454; Merriman v. State, 3 Lea (Tenn.) 393;
Dimick v. Downs, 82 Ill. 570; 5 Am. & Eng. Ency. Law,
859; 10 Ency. Pl. & Pr. 310; Huckabaa v. State, 4 Ala. App.
68, 58 South. Rep. 684; State v. Romero, 117 La. 1003, 42
South. Rep. 482; Florence v. State, 61 Tex. Cr. Rep. 288,
134 S. W. Rep. 689. Where the defense interposed is a
complete denial of the act charged, the question of consent
is not involved, and therefore such testimony, affecting as
it does only the probability of consent, is immaterial.

At the time of the entry of the judgment and the filing
of this opinion, the court is constituted of five members.
I am authorized to say that Mr. Justice Whitfield and Mr.
Justice Ellis concur in this opinion to this point. Mr.
Justice Brown also concurs, except as to the admission in
evidence, as a part of the confession, of certain matters
which he considers were in the nature of admissions against
interest rather than a confession, as set forth in the opinion
of Mr. Justice Terrell. The views of Mr. Justice Terrell are
expressed in a separate opinion herein filed.

I am further authorized to say that Mr. Justice Terrell
and Mr. Justice Brown concur in all that portion of the
opinion which follows hereafter. Mr. Justice Whitfield
and Mr. Justice Ellis dissent.

Two assignments question the correctness of the action
of the trial court in sustaining objections made by the State
to certain questions propounded to two of defendant's wit-
nesses by whom it was sought to show that Dr. Taylor, a
witness for the State, had made previous statements con-
cerning the result of his physical examination of the pros-
ecutrix which were inconsistent with his testimony at the
trial. The State's witness, Dr. Taylor, whose testimony
has been largely quoted at length hereinabove, after having

testified in response to a question interjected into his cross-examination by the State, that "taking everything into consideration, all the wounds, and the surroundings, and the shock, and all those things, it is my (the witness) opinion that she (the victum) was raped," further testified upon cross-examination as follows: Q. "I will ask you this question, Doctor: Do you remember of having had a conversation with J. B. Rooney, and J. F. Hammond?" A. "Mr. Bunch, I remember having held conversations with a good many people, and I imagine, I believe I recall those gentlemen, the names at any rate. I probably would not recall their faces." Q. "They were from Jacksonville?" A. "They were from Jacksonville, yes sir." Q. "They went to see you about this matter, didn't they?" A. "Yes sir." Q. "You talked to them about it, didn't you?" A. "I think so, yes." Q. "This was some time after you made this examination under the microscope?" A. "Some considerable time after that." Q. "It was. You are right in that. Doctor, didn't you tell Mr. Hammond and Mr. Rooney, that from your examination, that you were of the opinion that Mrs. Moore had not had intercourse with any man for several hours before you made that examination?" A. "No." Q. "Or words to that effect?" A. "I think I told them—I probably worded it, using the word opinion but it was a wrong use of the word for the idea that I had in mind." The witness then proceeded to state his recollection of the conversation.

Rev. J. B. Rooney, mentioned in the cross-examination, was subsequently sworn as a witness for the defendant, and testified that on the occasion referred to in Dr. Taylor's cross-examination he had a conversation with Dr. Taylor, further testifying: "Q. You say you had this conversation with the doctor in his office in DeLand, as I understood you a while ago?" A. "Yes sir." Q. "Was that conversation about this offense in this case, involved in this

case?" A. "It was." Q. "Did not Dr. Taylor tell you in that conversation, in the presence of Mr. Hammond, in his office there, that he had examined Mrs. Moore on the afternoon of this alleged offense, and that from his examination he was certain she had not had any intercourse with any man for several hours prior to the time that he examined her?"

The State objected to the question upon the grounds "that the proper predicate therefor had not been laid, and that the question in the manner framed is an improper question by which to impeach the testimony of Dr. Taylor." The objection was sustained, and defendant excepted.

The proper foundation having been previously laid on cross examination prior inconsistent statements made by a witness produced by the opposing party relative to matters material to the issues in controversy are admissible in contradiction of his testimony at the trial, unless the witness distinctly admits having made such statements. Such testimony goes to the credibility of the witness. Section 2711, Revised General Statutes, 1920, provides:

"If a witness, upon cross examination as to a former statement made by him relative to the subject matter of the cause and inconsistent with his present testimony, does not distinctly admit that he has made such statement, proof may be given that he did in fact make it; but before such proof can be given, the circumstances of the supposed statement, sufficient to designate the particular occasion, must be mentioned to the witness, he must be asked whether or not he made such statements."

The provisions of this section relate only to the impeachment of a witness called by the opposing party. The circumstances of the supposed inconsistent statement are sufficiently designated when the attention of the witness sought to be discredited is fairly called to the time and place of the supposed statement and the person or persons

to whom it was made. Perfect precision in the matters referred to is not required by the rule. It is enough if the stated circumstances are so designated as to afford the witness ample opportunity to refresh his memory, so that he cannot be taken by surprise, and to make intelligent answers admitting the inconsistent statements or offering such explanation thereof as he may desire. Brown v. State, 46 Fla. 159, 35 South. Rep. 82; Alford v. State, 47 Fla. 1, 36 South. Rep. 436; Adams v. State, 54 Fla. 1, 45 South. Rep. 494; Bennett v. State, 66 Fla. 369, 63 South. Rep. 842; Hoover v. State, 91 Ohio St. 41, 109 N. E. Rep. 626; Grant v. United States, 28 App. Cas. (D. C.) 169; People v. Row, 135 Mich. 505, 98 N. W. Rep. 13; State v. Hazlett, 14 N. D. 490, 105 N. W. Rep. 617; People v. Werner, 174 N. Y. 132, 66 N. E. Rep. 667; Harmon v. State, 166 Ala. 28, 52 South. Rep. 348.

The matters in reference to which it was sought to show the contradictory statements by the State's witness Dr. Taylor were material to the issues. By the testimony above quoted, and other like testimony, the defendant had laid a sufficient foundation for the introduction of impeaching testimony. The testimony to be elicited by the questions to which the State's objection was sustained should have gone to the jury as affecting the credibility of the State's witness. If Mr. Rooney had answered the question in the affirmative it would have tended to contradict Dr. Taylor's previous testimony. It would then be for the jury to determine what weight would be given to the testimony concerning the contradictory statement, and whether it was sufficient to affect their belief in the testimony in chief given by the physician. It was therefore error for the trial court to sustain the objection to the question hereinabove quoted. Although there may have been other evidence entirely independent of Dr. Taylor's testimony upon which the jury's verdict of guilt could have been based,

*non constat* the verdict may have been based at least to some substantial degree upon that testimony, which, under the ruling of the trial court, stood uncontradicted. What effect the admission of the proffered impeaching testimony may have had upon the jury, and upon the verdict rendered by them, is a matter of surmise. Even with the proffered impeaching testimony before them, or had the physician not testified at all, the jury in this case, conceivably, *might* have found the same verdict. But we cannot say, as a matter of law, from this record that such *would* have been the result. Although the physician's testimony may be judicially regarded as of slight evidentiary value in this instance *upon the question of the penetration,* his entire testimony, standing unassailed, may have been accorded substantial weight by the jury. In view of the important function of the physician's testimony in such cases, and the weight this character of testimony when unassailed, would ordinarily carry with a jury, we cannot say as a matter of law that the exclusion of the impeaching testimony was without prejudice to the defendant, or that its admission would not have weakened other testimony properly admitted. The judgment is therefore reversed and a new trial granted.

Reversed.

WHITFIELD, J., dissenting.

The reversal is based solely upon a ruling of the trial court in sustaining an objection to a question by which it was sought to discredit certain testimony of a State witness on the ground that he had made contradictory statement as to the matter.

On cross examination of an expert witness for the State, he was after stating time and place asked: "Doctor, didn't you tell Mr. Hammond and Mr. Rooney, that from your

examination, that you were of the opinion that Mrs. Moore had not had intercourse with any man for several hours before you made that examination?" A. "No." Then followed an explanation by the expert witness as to what he had said on the subject. The defense produced Mr. Rooney as a witness and after stating the time and place asked him: "Did not Dr. Taylor tell you in that conversation, in the presence of Mr. Hammond, in his office there, that he had examined Mrs. Moore on the afternoon of this alleged offense, and that from his examination, he was certain she had not had any intercourse with any man for several hours prior to the time that he examined her?"

The objections by the State to the question were "that the proper predicate therefor had not been laid, and that the question in the manner framed is an improper question by which to impeach the testimony of Dr. Taylor." The court properly sustained the objection to the question as asked. The question "in the manner framed" was a leading question, and the trial court will not be held in error for sustaining an objection to it on that ground. See Wood v. State, 31 Fla. 221, 12 South. Rep. 539; See also 40 Cyc. 2752, 2775.

A leading question should be permitted only when it appears essential to justice; where a witness is persistently unwilling or biased, or there exists some like reason, the court should allow it. In some cases a party may and should be permitted to lead his own witness. This matter, however, is in the discretion of the court. It is not ground of error, and Appellate courts universally refuse to review such exercise of discretion. Coker and Scheiffer v. Hayes, 16 Fla. 368; Stinson v. State, 76 Fla. 42, 80 South. Rep. 506; Silvester v. State, 46 Fla. 166, 35 South. Rep. 142. The foundation as laid was to contradict the witness in his denial that he had stated he was "of the *opinion* that Mrs. Moore had not had intercourse with any man for several

hours before" his examination of her, while the question asked the impeaching witness was: "Did not Dr. Taylor tell you  *  *  *  that from his examination he was *certain* she had not had any intercourse with any man for several hours prior to the time that he examined her?" The impeaching question was quite different from the question asked the witness, Myers v. State, 43 Fla. 500, 31 South. Rep. 275. Where the impeaching question is leading, a proper objection thereto may be sustained by the trial court within its discretion without committing material error, particularly where it is not, at least in substance and effect, the same question that had been put to the witness sought to be impeached. Upon sustaining a proper objection to a leading question an appropriate question may be asked. To be of the "opinion" (in this case a qualified opinion) that there had been no sexual intercourse within a few hours is not in substance or effect the same as to be "certain" that no such intercourse had been had within the time stated.

After an objection was properly sustained to another question asked the impeaching witness, that witness was asked: "Will you please state what Dr. Taylor said to you in that conversation about the result of his examination of Mrs. Moore, and his opinion on the same." This question was objected to "because it calls for hearsay testimony, and because the question in the manner framed is an improper question by which to impeach the testimony of any witness." The objection was sustained and the defendant excepted to the ruling. Even if the question as framed was not subject to the second ground of the objection because too broad, so that the court committed technical error in sustaining the objection to the last stated question, and if the ruling may be regarded as covered by the assignment of errors, such ruling could not reasonably have been harmful to the defendant in view of the nature of the testimony

of Dr. Taylor as an expert witness. Besides this, the verdict is fully sustained by legal and sufficient evidence, even if all the testimony of the expert witness Dr. Taylor be wholly disregarded. Such testimony was not of a nature that would prejudice the jury against the defendant.

ELLIS, J.—I concur in the dissenting opinion of Mr. Justice WHITFIELD not only for the reasons set forth in that opinion, but also for the further reason that the attempted impeachment of the witness Dr. Taylor was upon an immaterial matter. Assuming that the word "intercourse" as used both in the question propounded to Dr. Taylor and Mr. Rooney the impeaching witness, meant "sexual intercourse", or something more than carnal contact or penetration, the matter inquired about was immaterial if indeed it cannot be said to be favorable to the defendant, because the term "sexual intercourse" implies not only the emission of seed, but consent. It is coition, it is sexual copulation. Then if the doctor had in fact said what he was imputed to have said he meant that while there was no emission of seed there was also no consent by the woman to the penetration, which without emission of seed constitutes rape if accomplished by force and against the woman's will. The doctor himself in his testimony drew the distinction between mere penetration and sexual intercourse or coition between the parties.

On an indictment for rape it is not necessary for the State to prove emission in order to sustain the charge. Proof of penetration alone is sufficient. See Barker v. State, 40 Fla. 178, 24 South. Rep. 69; Harris v. State, 72 Fla. 128, 72 South. Rep. 520. So it follows that if by the word intercourse the attorney for defendant meant to convey the idea of something more than mere penetration of the woman's genital organ and that meaning was in the minds of Dr. Taylor and Mr. Rooney when they answered the questions

propounded to them respectively, the question related to an act not necessary to prove as an element of the crime of rape, and therefore irrelevant.

TERRELL,-J.—Aubrey Lee Nickels was tried and convicted for the crime of rape. The penalty of death was imposed, and writ of error was taken to this court seeking reversal of the judgment so imposed on the following grounds, to-wit: (1) denying defendant's motion for new trial; (2) admitting in evidence defendant's confession dated December 14, 1921; (3) exclusion of proffered testimony on the part of defendant as to previous reputation of the prosecutrix for chastity; (4) exclusion of proffered testimony on the part of the defendant as to contradictory statements made by Dr. Taylor (one of the main witnesses for the State) in proof of the *corpus delicti.*

The motion for new trial was based on the insufficiency of the evidence to support the verdict and on the further fact that the verdict was contrary to law. The testimony is mysterious and contradictory and in many of its aspects impossible to reconcile, but since the case must be reversed on other assignments, a discussion of this question becomes unimportant at this time.

Was the alleged confession of defendant dated December 14, 1921, competent testimony? A confession is an acknowledgment in express words by the accused in a criminal case, of the truth of the guilty fact charged, or some essential part of it. It is restricted to defendant's guilt and necessarily excludes guilty conduct, exculpatory statements and acknowledgment of subordinate facts colorless with reference to actual guilt. 2 Wigmore on Evidence (2nd ed.) 134; 2 Wharton's Criminal Evidence (10th ed.) 1265, 1266; Greenleaf on Evidence par. 170; 6 Am. & Eng Ency Law 521; Underhill's Criminal Evidence (3rd ed.) 303; 1 R. C. L. 550.

To be competent evidence the alleged confession must not only conform to the rule as above stated, but it must be free and voluntary. A voluntary confession is one which springs from the spontaneous suggestion of the party's own mind. It is not voluntary if induced through fear, threats, hope of reward, personal abuse and violence, direct or implied promises by authorities, artifice, playing upon emotions, invective statements, over persuasion, coercion, illusage, assault, *persistent questioning and fright,* intimidation or undue influence or duress, Underhill's Criminal Evidence 311, (Supra, and cases cited); Sims v. State 59 Fla. 38, 52 South. Rep. 198; Daniels v. State 57 Fla. 1, 48 South. Rep. 747; Green v. State, 40 Fla. 474, 24 South. Rep. 537; Gatling v. State 40 Fla. 237, 23 South. Rep. 857; Holland v. State, 39 Fla. 178, 22 South. Rep. 298; Coffee v. State, 25 Fla. 501, 6 South. Rep. 493, Ziang Sung Wan v. U. S. decided by Supreme Court U. S. Oct. 13, 1924.

In People v. Parton, 49 Cal. 632, it was held that a confession receivable in evidence only after proof that it was made voluntarily, is restricted to an acknowledgement of the defendant's guilt and the word does not apply to a statement made by a defendant of facts which tend to establish his guilt. Parton was charged with rape and the mother of the prosecutrix testified in effect that he admitted to her that he (Parton) was ruining her daughter, that he was sorry for it, asked her forgiveness and said he was glad they had caught him because in a year or two she (the prosecutrix) might have been ruined. The court said that this evidence was at most an admission that Parton had taken improper liberties with the prosecutrix, or had with her consent attempted carnal intercourse with her, but however immoral his conduct, his admission was not a confession of his guilt of the crime of rape for which he was indicted, nor of any offense included in that crime.

In State v. Red, 53 Iowa 69, 4 N. W. Rep. 831, it was held

that a confession by one accused of crime is an admission of the criminal act itself. An admission of other facts, however strongly they may tend to establish his guilt, cannot be considered as a confession. That a defendant charged with murder had stated that certain articles in his possession and which he was seeking to conceal, were property of the person murdered, was held not to constitute a confession that he had committed the murder.

In State v. Jackson, 95 Mo. 623, 8 S. W. Rep. 749, a leading case on the question of proving a confession by admitting testimony of other crimes, it is held that a persons's admission or declaration of his agency or participation in a crime, or in other words, a confession is limited in its precise scope and meaning to the criminal act itself for which the confessor is then on his trial. It is not an admission of a fact or circumstance from which guilt of that crime may be inferred.

Now let us apply the rule as above defined to the alleged confession of the defendant. The alleged confession, including objections of counsel to its admission, covers 375 pages of the record, and begins with the following statement by defendant: "Well, when I was in DeLand, I was only there for a short while; and I asked a gentleman where I could get a sporting woman. He said he would get me one for two dollars. I told him I didn't have the money. And I had about a dollar and eighty cents, something like that, and he says, 'Well, give me a dollar and I'll show you where her house is.' So, he carries me to this house and I gave him the dollar. He told me to go in as a plumber. So, I did. I had never seen this woman before. So, when I went in, I cut her water and I left her house and I went to find this fellow and he couldn't be found. So, I went back to this house. I went in the bath room, and she was telling me about some water that kept running and I tried to fix it for her. And she came in the bath room the first time and

talked to me, and then went out. And then she came back the second time, and I grabbed her and she screamed; and she told me to quit, said her mother-in-law lived next door. And she called for her mother-in-law again. I threw her down. And then she told me she says, 'Well, it's up to you, I will let you go your way.''

Immediately following this statement the defendant was put through a rigid cross-examination as to what he did when he threw the prosecutrix down, what part of the house they were in, whether or not he struck her, what he struck her with and how many times, and if she was conscious, did he strike her before or after intercourse, and how many times did he have intercourse with her, did he throw her down by force, and if she resisted him or gave permission, did he throw her down and strike her when she screamed, did he tie her, and all about the tieing, did he put anything in her mouth, did he lock the door and did she get up after intercourse, all about his taking certain rings, a watch, a child's bank and a razor from the house, whether or not he had a pistol and drew it on her, and the scuffle between them for possession of the pistol, all about the enormity of the crime he had committed, chewing her breast, his leaving DeLand where it all took place, pawning the jewelry and articles taken from the house, what else he took from the house and his arrest under suspicious circumstances in Jacksonville.

The alleged confession here complained of was embraced in the foregoing statement of defendant and all the facts exemplified on cross-examination covering many typewritten pages.

All the proceedings incident to securing this alleged confession took place at the police station in Jacksonville shortly after defendant was arrested and in the presence of the court reporter, the chief of police, the jailor and counsel who conducted the examination.

Now let us analyze this alleged confession a little. The statement made by defendant preliminary to the cross-examination discloses nothing in the nature of a confession of his guilt of the crime of rape for which he was indicted, nor of any offense included therein. It is further not an admission of a solitary fact or circumstance from which guilt of the crime of rape may be inferred. Taken in its most favorable aspect it is indicative only of depraved morals on the part of defendant, that he had taken improper liberties with the prosecutrix, or had after an assault attempted carnal intercourse with her to which she consented. State v. Jackson; State v. Red, and State v. Parton, *supra*.

As to the cross-examination feature of the alleged confession it is proper to state that it was elicited by skillful counsel by persistent questioning, and covered a wide range of facts and circumstances, all of which related to guilty conduct and acknowledgment of subordinate facts colorless with reference to actual guilt of the crime charged. Such facts are necessarily excluded as confessions of the crime or any essential part of it, according to Wigmore, Wharton, Greenleaf, Underhill and other text writers and authorities already cited in this opinion. Facts indicative of guilty conduct and circumstances from which guilt may be inferred may under proper restrictions be shown or brought out in a judicial investigation, but they are no part of a confession of the criminal act for which the confessor is on trial.

The mere fact that a confession was drawn out by questioning the accused does not invalidate it as such, but when it is so obtained the questions must be directed to the criminal act for which the confessor is on trial and cannot extend to other facts showing guilty conduct and circumstances from which guilt may be inferred, however strongly they may tend to establish it, otherwise, there is no limitation to what may be put in evidence as a confession. The

cross-examination feature of the confession in the instant case in addition to the foregoing violations of the rule as to contents, extended to facts that had no connection whatever with the crime charged, and to admit it as a confession was highly prejudicial to defendant's guaranteed right of fair and impartial trial.

But there is another reason why this alleged confession was incompetent testimony. Preliminary to taking it, counsel who conducted the cross-examination made the following statement to the accused:

"You are under arrest here by the Police Department, and you are going to be charged with rape. We want to know if you want to make a statement as to what you did, and with the understanding that you are not compelled to make any statement unless you want to. It is entirely optional with you. We want you to understand that you have the privilege of refusing to make any statement if you want to. If you do make a statement, it will be used against you in the event that you are indicted by the Grand Jury of Volusia County, charged with rape, when you are given a trial upon that charge in that county. Do you want to make a statement?"

The accused responded to this statement as follows: "Well, yes, sir, I can do it, sir, if you want me." The response of accused was followed by this statement: "All right; I *want you* to tell the Chief of Police here; this is a deputy court reporter of the Fourth Judicial Circuit, and Mr. Kirby Foster, Jailor, and my name is W. A. Hallowes, Jr. With that understanding from you that you are willing to make the statement, *we want you* to tell us just exactly what occurred; what you did down in DeLand, starting from the beginning of it, right on through."

It will be borne in mind that defendant at this time was twenty years of age, and if we may judge from the records that have been here in this case he was of impaired or weak

mentality, that he was a stranger in a strange land, without counsel or friends, surrounded by the jailor, chief of police, court reporter and counsel for those seeking his confession, and from his own statement knew that he was being hunted by a mob. It is true that no physical force was used, no threats or promises were made, and he was advised that he did not have to make a statement and such as he made would be used against him, but he was also told that he was going to be charged with rape, and was repeatedly admonished that "*I want you*" and "*we want you*" to tell us what occurred. These facts in connection with defendant's reaction throughout to the lengthy cross-examination are inconsistent with any theory that the alleged confession sought and elicited in such manner was freely and voluntarily made under circumstances that afforded no undue influence in procuring it, or that it sprang from the spontaneous suggestion of defendant's own mind, or that the mind of the accused was free to act at the time uninfluenced by fear. Parker v. State 46, Tex, Crim. Rep. 461, 80 S. W. Rep. 1008; People v. Quan Gim Gow, 23 Cal. App. 507, 138 Pac. Rep. 918; Robertson v. State, 81 Tex. Crim. Rep. 378, 195 S. W. Rep. 602, 6 A. L. R. 853; 1 R. C. L. 566; Owsley v. Commonwealth, 31 Ky. L. Rep. 5, 101 S. W. Rep. 366; Gallher v. State, 40 Tex. Crim. Rep. 296, 50 S. W. Rep. 388.

The correct test in all cases to determine whether or not a confession is free and voluntary is to determine whether under all the circumstances of the particular case the will of the confessor was overcome or broken down. It is well settled that in applying this test the court should take into consideration the circumstances, situation, age, character, mental condition and other surroundings of the accused at the time it was made. A determination may not rest on any one of these facts, but a consideration of them all. Beckham v. State, 100 Ala. 15, 14 South. Rep. 859; Lavison v. State,

54 Ala. 520; Hoober v. State, 81 Ala. 51, 1 South. Rep. 574; Commonwealth v. Sheets, 197 P.a. 69, 46 Atl. Rep. 753; Young v. State, 68 Ala. 569; Johnson v. State, 59 Ala. 37; Owsley v. Commonwealth, *supra;* Brister v. State, 26 Ala. 107; Washington v. State, 53 Ala. 29; Sampson v. State, 54 Ala. 241; United States v. Cooper, 25 Fed. Cas. No. 14864; Ammons v. State, 80 Miss. 592, 32 South. Rep. 9, 18 L. R. A. (N. S.) Note 786 where every phase of the subject Voluntary Confessions is treated; Cady v. State, 44 Miss. 332; State v. Squires, 48 N. H. 364.

It is of course desirable to apprehend and punish criminals; at the same time the law insures the citizen certain safeguards that should never be lost sight of especially by those whose duty it is to administer the law. Many facts brought out in the alleged confession were mere independent statements raising an inference of defendant's guilt, some of which might have been properly proven as "admissions" in a judicial investigation; but under the rule here approved they are not confessions. A confession is distinguished from an admission by the fact that an admission is a statement of a fact not necessarily incriminating the accused, while confessions must be shown to be entirely unprompted either by motives of hope or fear. Daniels v. State, 57 Fla. 1, 48 South. Rep. 747; Bates v. State, 78 Fla. 672, 84 South. Rep. 373; Parrish v. State, decided this term; Underhill's Criminal Evidence (3rd Ed.) 304.

The necessity for drawing a line between confessions and admissions arises from the fact that admissions are always admissible as an exception to the rule excluding hearsay, irrespective of the motive or inducement which prompted them provided they are made against the interest of the person making them.

In Daniels v. State, *supra,* this court prescribed the following rule with reference to the admission of confessions:

"Where a person is on trial for a crime, evidence of a confession of guilt of the crime previously made by such person is in general not admissible unless it appears that the confession was entirely voluntary. If such confession is made while the party is under arrest or charged with the crime, evidence of the confession is not admissible on the trial unless it is made to clearly appear that the party was fully advised of his rights and that after being so advised the confession of guilt was freely and voluntarily made under circumstances that afforded no undue influence in procuring the confession."

This court has also repeatedly held that confessions should be acted upon by courts and juries with great caution, and in order to render a confession voluntary the mind of the accused must be free to act at the time, uninfluenced by fear or hope, and this must be shown before the confession is offered. Coffee v. State, 25 Fla. 501, 6 South. Rep. 493; Holland v. State, 39 Fla. 178, 22 South. Rep. 298; Gantling v. State, 40 Fla. 237, 23 South. Rep. 857; Green. v. State, 40 Fla. 474, 24 South. Rep. 537; Daniels v. State, *supra;* Sims v. State, 39 Fla. 38, 52 South. Rep. 198.

It therefore appears that the confession in this case was not free and voluntary, that the accused was not fully advised of his rights in the premises before making it; that it was not directed solely and specifically to the crime for which defendant was under indictment; that it was brought out on a cross-examination involving many admissions of fact and circumstances that were no part of an extra-judicial confession, and that it afforded the prosecution a means to get evidence of facts to the jury that could not have been gotten before them under the strict rules of evidence, thereby compelling defendant to be a witness against himself contrary to the provisions of Section 12 of our Bill of Rights. For these reasons, and others painfully apparent

on the record the more it is analyzed, it should have been excluded.

As to females over ten years of age our statute re-enacts the provisions of the common law defining rape, the three ingredients of which were carnal knowledge, force and the commission of the act against her will or without her con-:rent.    Common law and statutory rape are different only in this: to the former force and resistance are necessary, while to the latter they are not essential, but may be present or absent without affecting the criminality of the fact of carnal knowledge. 22 R. C. L. 1172 and cases cited. In a trial for common law rape the character of the prosecutrix for chastity was always subject to impeachment. See State v. Roderick, 77 Ohio St. 301, 82 N. E. Rep. 1082, 14 L. R. A. (N. S.) 704, Note 714 where many cases are cited.

The concluding assignment of error relates to the action of the trial court in sustaining objection of the State to proffered testimony of defendant to the effect that Dr. J. E. Taylor had stated soon after his examination of the prosecutrix that in his opinion she had not been raped.

Dr. J. E. Taylor was the main witness for the State and was called to treat the prosecutrix immediately after she is alleged to have been raped.  He testified at the trial that he made a thorough examination of the prosecutrix, that he examined under the microscope specimens from the contents of her vagina and found no spermatozoa or male seed, or other visible evidence of the crime charged.   He stated to the jury, however, that in view of bruises on her body else-where and her general nervous condition when he reached her, in his opinion she had been raped.   This testimony was given in April, 1924.

The purpose of the excluded testimony was to show that soon after the examination was made in December, 1921, Dr. Taylor had stated to the witnesses offered or in their presence that he did not believe the prosecutrix had had

intercourse for several hours prior to his examination; that his examination revealed no indication of rape, and other statements of a like nature contradictory to his testimony at the trial.

Any witness called by the opposing party can be impeached by proving that on a former occasion he made a statement inconsistent with his statement made on trial, provided such statement is material to the issue. The statement upon which it is intended to contradict must involve facts in evidence and the varying statements sought to be shown must be relevant to the issue. The proper foundation should also be laid for such impeachment by asking the witness on cross-examination as to such contradictory statements. The practice almost universally approved requires that the preliminary questions should be specific as to (1) time; (2) place; (3) person, and (4) circumstances so that the witnesses' attention may be specifically called to the matter on which it is proposed to impeach him. Brown v. State, 46 Fla. 159, 35 South. Rep. 82; Alford v. State, 47 Fla. 1, 36 South. Rep. 436; 1 Wharton's Crim. Ev. (10th ed.) 993, 995; Underhill's Crim. Ev. (3rd ed.) 543, citing many cases.

The alleged contradictory statements of Dr. Taylor were material to the issue and under the restrictions here defined should have gone to the jury. For reasons announced in this opinion I think the judgment should be reversed, and a new trial awarded.

BROWN, J.—I concur in the foregoing able opinion of Mr. Justice TERRELL, excepting only those portions holding that the confession was not voluntary, though I realize that the question is a very close one. And with reference to the lengthy statement admitted as a confession, I concur fully in the views of Mr. Justice TERRELL, that much of it was not a confession at all, but merely admissions against

interest of various facts, some of them colorless, some of them facts from which guilt might have been inferred, but not admissible as a confession, and that to admit them as such was prejudicial error.