PEOPLE OF PUERTO RICO, Plaintiff and Appellee, v. IGNACIO FLORES, Defendant and Appellant.

No. 4952.—Argued June 14, 1933.—Decided July 19, 1933.

422

*Felipe Colón Díaz* for appellant. *R. A. Gómez, Fiscal,* for appellee.

MR. JUSTICE CÓRDOVA DÁVILA delivered the opinion of the Court.

Ignacio Flores, upon being found guilty by a jury of the crime of rape committed on the person of María Leonarda Figueroa, was sentenced by the District Court of Ponce to five years' imprisonment in the penitentiary. Feeling aggrieved by that judgment, the defendant took the present appeal. It is urged that the court *a quo* erred ''in permitting, over the objection of defendant, that the testimony of the prosecutrix, María Leonarda Figueroa, who is an illiterate person and who, as stated by the district attorney at the beginning of the trial, is a deaf mute, be presented to the jury through the interpreter Juan José Figueroa, who is an illiterate person and the brother of the prosecutrix, and who lacked the necessary preparation to serve as such interpreter.''

Two grounds are assigned by the defense in support of the contention that the admission of Juan José Figueroa as interpreter was erroneous: the illiteracy of said interpreter and of his sister, and the relationship existing between them. The defendant does not object to the admission of the testimony of María Leonarda Figueroa, but complains that her testimony was transmitted by an interpreter who was illiterate and lacked the necessary preparation to act as such interpreter.

The district attorney announced first that the prosecutrix was a deaf mute, and that it was necessary to obtain her testimony through an interpreter after the latter had been examined as to his capacity and competency to interpret said

deaf mute. The witness appeared in court. She was examined by the district attorney and the judge and answered the questions made to her by gutural sounds and signs with the fingers, without uttering any word. The defense waived a cross-examination and insisted that it had not been proved that she was a deaf mute. The court admitted her as a witness. The interpreter was then examined to determine his capacity as such. He was subjected to a lengthy cross-examination, and stated that María Leonarda Figueroa was his youngest sister, that they lived together since she was born, that said sister was born deaf and dumb and that they have always understood each other by signs, that he understood everything she communicated to him, and that he has never heard her utter an intelligible word.

The court, after the district attorney and the defense had examined the witness, admitted him as an interpreter, and said: "The court believes that the witness has qualified as an interpreter of María Leonarda Figueroa, who is a deaf mute, in accordance with the decision in the case of *People* v. *Arroyo*, 38 P.R.R. 473, where the prosecuting attorney tried to offer the mother as a witness and the defense objected. Then an expert was called and he qualified as such because he had four brothers who were deaf and dumb, and he communicated with them by signs. So that as to capacity, the court thinks that the witness has qualified." The defense took an exception to the ruling of the court. We do not think that the illiteracy of José Figueroa was sufficient to preclude him from acting as interpreter of the deaf mute if, as a matter of fact, he was accustomed to communicate with her by signs and could understand what she said. In the case of *People* v. *McGee*, 1 Denio (N. Y.) 19, it was held that it was not necessary that the deaf mute should know how to read and write. It should not be necessary for the interpreter to have those qualifications either. What is important is that he is accustomed to communicate with the deaf mute by means of questions and answers made by signs

mutually understood. In the cited case of *People* v. *McGee* the deaf mute concerned had very little understanding, but it was proved that she could make signs and that she had sufficient knowledge to protect herself and communicate her desires and to observe things of which she would inform the interpreter by signs understood by the latter, and she had no difficulty in carrying on an ordinary conversation. The court held that there was no objection to her competency as a witness to testify through an interpreter by signs, although she could not talk or write. In said case the witness who acted as an interpreter had previous knowledge of the understanding and capacity of the person whose evidence he was called upon to transmit.

In our opinion, the capacity of the interpreter can be established, in a case like the present one where the deaf mute is an illiterate person, by proving that he is accustomed to communicate with the deaf mute by means of signs, that he is understood by the latter, and that he understands the real meaning of her signs. In the case of *Bugg* v. *Houlka*, 9 A.L.R. 480, decided by the Supreme Court of Mississippi, a deaf and dumb witness testified through an interpreter. In that case the court said:

"There is no merit, we think, in the argument that the interpreter was incompetent. It has been ruled that the interpreter for a deaf and dumb person need not be an expert if he can sufficiently understand the signs usually employed by the witness, and can well and truly interpret the meaning."

Appellant argues that Juan José Figueroa, being the brother of the witness, "would be greatly interested in the success of the prosecution by the district attorney, and that he was a person without any instruction whatever who was not in a condition to interpret the questions put by the attorneys for the defense to the prosecutrix." We do not think that relationship is a ground for disqualification of a person to act as an interpreter when the testimony of a deaf mute must be transmitted. The relatives, who have been in

constant association with the deaf mute and become familiarized with his signs, which they understand, and who are understood by him, at times may be the only persons available to act as interpreters and those most capable to transmit faithfully his testimony, especially when the deaf mute does not know how to read or write. The interest which a witness may have in a particular case is not at the present time a ground for incapacity. There is no doubt that if the acts charged in the indictment had been committed in the presence of Juan José Figueroa, he would have been qualified to testify as a witness in spite of the fact that he was the brother of the deaf mute. Hence he was also qualified to transmit her testimony after swearing to interpret it faithfully.

The second error attributed to the court is that it refused to permit the defense to ask María Leonarda Figueroa if she had previous sexual intercourse with other men. The question put by the defense was as follows: "Did she, prior to that night, have sexual intercourse with other men?"

Appellant maintains that on cross-examination he had a right to investigate the conduct of the prosecutrix. The court did not permit the defense to ask said question, and reserved to it the right to offer this defense at the proper time as evidence for the accused. Even assuming that this question was admissible in the form asked, we think that the ruling of the court did not prejudice any right of the accused. The defense when stating the theory of its case, stated that the accused was not liable for the acts charged by the district attorney, because he did not commit the same, and the accused himself, in answer to questions put by the defense, stated that he did not have any sexual intercourse with the deaf mute, who is his cousin and whom he respects as a relative. The defendant can not complain that he was prejudiced by the rejection of said question, since he denied having had sexual intercourse with the deaf mute.

The Supreme Court of Utah, in the case of *State* v. *Scott*, 188 Pac. 864, in discussing a question practically identical with the one raised by the defense in the instant case, said:

"It is next urged that the court erred in refusing to permit the defendant to prove that the general reputation of the prosecutrix for chastity was bad. In other words, that she was reputed to be unchaste in the community where she lived. Defendant's counsel insist that under the authorities such evidence was proper. In view that the defendant denied that he was with the prosecutrix on the night in question, and denied that he had had sexual intercourse with her then or at any time, we cannot conceive how such evidence had any relevancy in this case, except perhaps to affect the credibility of the prosecutrix. It was however, not offered for that purpose, and it is not contended here that it should have been admitted for that purpose. Where the defendant admits the sexual act, but contends that the prosecutrix consented thereto, and where, as here, she is of lawful age, such evidence is relevant and material upon the question of consent. While it is true that even a prostitute may refuse consent to the sexual act, yet, in contemplation of law, a lewed woman is much more likely to consent to such an act than a chaste woman would be; hence evidence that the prosecutrix was generally reputed to be unchaste is relevant for the purpose just stated."

The Supreme Court of Utah copies a paragraph from the opinion rendered by the Supreme Court of Florida in the case of *Rice* v. *State of Florida*, 35 Fla. 236, 17 So. 286, which reads as follows:

"Considering the line of defense adopted by the defendant, no injury could have been done him by ruling out this testimony. The only purpose for which such testimony was offered was to show a probability of consent on the part of the prosecutrix to the act of the defendant. The defense was not based upon any theory of consent to the act, but upon a denial by the defendant that he had ever had any carnal intercourse whatever with the girl."

See also the cases of *Jordan* v. *State*, 165 Ark. 502, 265 S. W. 71; *Nickels* v. *State*, 106 So. 479.

In the instant case, as the statements of the defense show, the evidence was offered solely and exclusively for the purpose of showing the probability of consent by the prosecutrix.

When the district attorney objected to the question asked by the defense, the latter stated that a case of rape by force and violence was under investigation, and that it was pertinent to know whether the prosecutrix had had sexual intercourse with other men. Nor was the defense successful with the evidence as to the conduct of María Leonarda Figueroa. Wenceslao Colón, a witness for the defense, testified that ten years ago the deaf mute bore him a son. Upon being asked what was her general reputation, he answered: "Only what I know. After that affair with me, she was not mentioned; she was a woman of her house."

The witness Ernesto Ortiz stated that he had known María Leonarda Figueroa for about 3 or 4 years; that he had no personal knowledge of her being the mistress of other men, although he had heard something to that effect. When asked whether he knew the reputation enjoyed in the community by María Leonarda Figueroa, he answered that he did not know. This is all the evidence offered by the defense with respect to the moral conduct of the deaf mute. As we have already said, the ruling of the court did not prejudice any right of the accused, since he emphatically denies having had any carnal intercourse with the prosecutrix. The alleged error is dismissed.

It is also maintained that the District Court of Ponce erred in its instructions to the jury, thereby prejudicing the substantial rights of the accused. The defendant in his brief calls attention to the second paragraph of the charge delivered by the court to the jury, which reads as follows:

"And as a first instruction, permit me, gentlemen of the jury, to inform you that you can not consider as evidence in the case the oral argument of the attorney for the defense nor that of the prosecuting attorney; that is, you are not to decide this case by what the prosecuting attorney or the attorney for the defense has said; but solely and exclusively by what the witnesses have testified here to-day."

It is clear that the oral arguments of the prosecuting attorney and of the defense counsel do not constitute evidence in the case. We assume, for, in our judgment, it so appears from the text of the paragraph above transcribed, that when the court informed the jury that it was not to decide the case by what the district attorney or the attorney for the defense had said, but solely and exclusively by what the witnesses had testified, it meant to repeat its statement that what was said by both parties was not evidence. It does not seem that the court referred to the arguments offered by both parties in support of their respective contentions. It is not proper for the court when instructing the jury to make statements tending to discredit the arguments adduced within the limits of the law and the facts in the case. The parties are entitled to be heard through their counsel, and to present their arguments to the proper extent, and it is the duty of the court to guarantee and protect the exercise of that right recognized by law. Although, as we have already said, the language used by the court does not have the scope attributed to it by the defense, however, it would have been preferable if at least the concluding portion of the instruction complained of had been omitted.

The defendant maintains that the instruction given by the court to the effect that it is sufficient that the corroborative evidence tend to prove some details establishing the connection between the accused and the crime, is not authorized by law. The charge delivered by the court to the jury regarding the corroboration, is as follows:

"According to the law, in prosecutions for rape, the accused can not be found guilty on the sole statement or testimony of the prosecutrix, unless her testimony is corroborated by some other evidence. It is not necessary however, that the corroborative evidence shall include or establish by itself all the elements of the offense, but it is enough if it tends to establish some details connecting the accused with the crime.

"  *      *      *      *      *      *      *

"Before going into said general instructions, it was my intention to discuss further the question of corroboration, upon which great emphasis was laid by the parties, whom the gentlemen of the jury can not follow, either. No man may be convicted of rape in Puerto Rico upon the sole testimony of the woman. You who are men can understand the danger that that would be. A woman would only have to say, 'So and so raped me', and if her sole statement were sufficient, you can understand the injustices that might be committed. For that reason the law provides and wisely requires that said testimony be corroborated by some other evidence. What evidence is that? I have already told you.

"The crime of rape, as all crimes, when committed is not committed in the presence of witnesses. When a person is going to commit a crime he generally looks for a place where no one can see him. Hence, corroboration is always required in this class of crimes, besides other proof. And it is not necessary that said evidence be of such a character that it will corroborate all the elements of the rape itself; that is not required by law. The only thing required is evidence of details which convey to the minds of the jury the connection that the accused may have had with the crime."

We think it unnecessary to discuss the question raised by the defense, because the evidence offered in this case, and which the jury believed when it brought a verdict of guilty, has sufficient elements of corroboration to support said verdict. The doctor testified first, stating that he had examined the genital organs of María Leonarda Figueroa and found that the hymen had been torn with marked ecchymosis of the labia minora and the adjacent tissue, ecchymosis in the hypogastrium and in the upper third part of the left leg, internal region, with a mucous-purulent secretion and a lowered fourchette, which are signs of sexual intercourse. The doctor certified that there were signs of recent sexual intercourse and of corporal violence. The said María Leonarda Figueroa had been deflowered previously.

The prosecutrix testified, through the interpreter Juan José Figueroa, that on the night in question, the accused whom she calls Tato, who is her first cousin, accompanied by an old man, Emiliano, grabbed her by an arm, took

her further down from the house where the dance was being held, pressed down her nose, grabbed her by force, shut her mouth, and had sexual intercourse with her.

The witnesses Eduvigis Ortiz, Germán Díaz and Andrés Corsino testified that María Leonarda Figueroa, the deaf mute, having disappeared from the dance, they went to look for her and found her further down from the house, near a ranch, and the accused Ignacio Flores was with her and also an old man, Emiliano; and that when they went near them to investigate what they were doing there, the accused stated that no one should come near, because the life of anyone doing so was in danger. Andrés Corsino told him he would see him in the court the next day, and the accused answered that he was not afraid of courts or judges or anyone; that the witnesses went away and the accused remained with the deaf mute, and they did not return to the house where the dance was held during the night until daybreak when Ignacio Flores, the accused, returned alone.

Germán Díaz stated that about two o'clock in the morning he saw that Emiliano Ortiz went to the door of the room where María Leonarda was, took her by an arm and making believe he was dancing with her, took her to the door where Ignacio Flores was and from there the three left, Leonarda walking quietly. The district attorney showed the witness a previous sworn statement, which the witness recognized and ratified, as may be seen from the following interrogatory:

"Do you remember having testified before Nogueras, the municipal judge as follows?: 'He handed her over to Ignacio Flores, who was at the entrance to the dance. Ignacio then put his arm around María Leonarda and took her away by force because she did not want to go.' Let us see which is the truth; what you deposed before the municipal judge, or what you have just testified, as to the points on which there is no agreement.

"Tormes: Very leading, Your Honor. We object to the manner in which the question is made.

"Judge: Objection sustained.

"Explain the contradiction.

"Witness: The contradiction is that I made a mistake in this statement here; but it is true that he put his arm around her.

"Prosecuting Attorney: He took her away by force?

"Colón: No, sir, I object.

"Tormes: With our objection; very leading.

"Judge: The court admits it.

"Prosecuting Attorney: He took her away by force?

"Tormes: That is a conclusion.

"Prosecuting Attorney: Did you not testify so there?

"Witness: After she was taken further down from the house she was taken by force.

"Prosecuting Attorney: Emiliano handed her over to the accused and the accused took her away by force? Was that so?

"Tormes: That is very, very leading.

"Witness: After the two had gone further down from the house, then they were using force. She, of course, when Ignacio Flores was taking her away, I did not notice whether she was crying, or as I did not know the purpose for which he was taking her away . . .

"Prosecuting Attorney: So that he was taking her away by force?

"Yes.

"Tormes: We still object.

"Prosecuting Attorney: Nothing further.

"Judge: Cross-examination.

"Tormes: Did you write that?

"I did not write that. I said it by word of mouth and someone else wrote it.

"Prosecuting Attorney: I then offer this in evidence.

"Tormes: With our objection, Your Honor.

"Judge: The court does not admit it because he has already explained here that due to the lengthy character of the statement he forgot that.

"Tormes: Did you see the force made by the accused when Emiliano delivered her to him?

"Witness: Sure. When they were going further down from the house, he put his arm around her and took her by force."

Germán Díaz also testified that he, Andrés Corsino, and Eduvigis Ortiz, a son of Emiliano Ortiz, who according to the witness had turned the deaf mute over to the accused, went out to look for her, the witness walking behind, and that upon meeting them, at a place where there is a small

ranch, Don Andrés said: "Where are you going with that woman?" and Ignacio answered that anyone coming near would be in danger, and that Don Andrés said: "Things are bad, let us go and the matter will be settled in court"; that when he saw Leonarda near the small ranch, she was moaning, as if she wanted to cry; that she was not crying but looked as if she wanted to cry. Eduvigis Ortiz, son of Emiliano, stated that María Leonarda was quiet; that she made no movements.

Narcisa Alicea, an aunt of the accused, as well as of the deaf mute also testified; she stated that on the night of the dance the accused took the deaf mute to her house and left her there.

As evidence for the defense, the accused presented four criminal records to show that four men had been charged by the district attorney with rape committed that same night on the prosecutrix herein. The bad reputation of the deaf mute in the community was also sought to be established, but without success. The accused himself testified last and stated that on the night in question he withdrew the deaf mute from the dance and took her to his aunt's house in order to avoid abuses which, as he claims, were being committed with her, and denied that he had had carnal intercourse with her. The prosecuting attorney questioned him as to the cause of the anger and indignation which the deaf mute exhibited against him, and he answered that it was because she hated him. We copy what the accused stated on this point in answer to the questions of the prosecuting attorney:

"Prosecuting Attorney: Did you hear what the deaf mute stated here this morning?

"Witness: Yes.

"Prosecuting Attorney: Did you hear her refer to you as Tato?

"Yes.

"Did you hear what she stated?

"Yes.

"This morning? Did you hear?

"I heard.

"What do you have to say?

"But that is not as she stated.

"How do you know it is not so?

"Because it is not so.

"To what do you attribute the anger she has towards you, that indignation she showed towards you from the chair?

"Because they hate me personally.

"Who?

"They.

"But the deaf mute, the deaf mute?

"The deaf mute.

"Why?

"Well, I don't know the reason.

"Are you a relative of hers?

"Yes. But you can have a brother and can hate him also.

"Why does she hate you, to the extent of accusing you in that manner?

"I do not know why she hates me.

"But you heard her this morning accusing you in that manner?

"Witness: Yes, I heard.

"Prosecuting Attorney: Don't you know why she hates you like that?

"I don't know the reason."

The jury passed upon the evidence and found Ignacio Flores guilty of the crime of rape. We think that there was corroborative evidence and that said evidence, which was believed by the jury, was sufficient to convict the accused. The last error assigned, to the effect that the verdict was contrary to the evidence, is therefore dismissed.

The judgment appealed from must be affirmed.

Mr. Justice Hutchison concurs in the result.